## GARNER *v.* SECOND NATIONAL BANK OF PROVIDENCE.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND.

No. 43. Argued October 19, 1893. — Decided January 22, 1894.

In Rhode Island a married woman holds the real and personal estate, owned by her at the time of her marriage, to her sole and separate use after marriage, and may permit her husband to manage it without affecting that use; and if the husband, without her knowledge and consent, invests a part of her property in real estate, taking title in his own name, and, on this coming to her knowledge after a lapse of time, she requires it to be conveyed to her, and such conveyance is made after a further lapse of time, the husband being at the time of the conveyance insolvent, her equities in the estate may be regarded as superior to those of the husband's creditors, if it does not further appear that the creditors were induced to regard him as the owner of it, by reason of representations to that effect, either by him or by her.

THIS appeal brings up for review a final decree dismissing a bill filed to obtain an injunction against the appellees, the Second National Bank, a national banking association having

its place of business in Providence, Rhode Island, Christopher A. Shippee, and Samuel W. K. Allen, from selling and conveying by deed or otherwise certain real property situated in that State, and from all attempts by actions at law or otherwise to oust Mary J. Garner, formerly Mary J. Graeffe, one of the appellants, from the peaceable and quiet enjoyment and possession of such property.

The case made by the bill is, substantially, as follows: In the winter of 1879 and 1880 Albert J. Graeffe, of New York, conceived the purpose of forming a joint stock company for manufacturing textile fabrics of wool and cotton. Having heard that there was certain mill property in Warwick, Rhode Island, that could be purchased and utilized at a moderate expense, he proposed to his wife, Mary J. Graeffe, who had considerable estate in her own right, that this mill property, together with other real estate and water rights adjacent and appurtenant thereto, known as the American Mills estate, be purchased, and equipped for manufacturing purposes. The husband represented to the wife, at the time, that the property could be rented to a company he proposed to form, and that such an investment of her money would be safe and remunerative. When the investment was proposed, the husband was the agent and trustee of the wife, having the care, custody, and management of her property. The wife, confiding in his representations, as well as in his judgment and good intentions, gave her assent to the proposed investment. But she expressly directed — and it was so understood between herself and her husband — that the property when purchased should be conveyed to her in fee and appear upon record in her individual name. The proposed purchase was made, the amount due for each parcel being paid out of the money of the wife which was in the hands of the husband as her agent and trustee, and was her sole and separate property. Contrary to the understanding with the wife, without her knowledge or consent, and in violation of her express directions, the husband caused the deeds and instruments of writing to be made out in his name, as if the fee was absolutely vested in him. In conformity with the original purpose, the property was equipped

for manufacturing purposes, the money expended to that end belonging to the wife. The result was that $48,910.94 of her money, in the hands of the husband, were expended in the purchase and equipping of this property. When the deeds were executed the wife believed that the property had been conveyed to her as her sole and separate estate, in accordance with her directions to, and understanding with, her husband, at the time of the proposed investment. She never heard that this understanding had been violated, until the summer of 1880, when she ascertained from her husband that the property stood in his name. She thereupon requested him to have it conveyed to her, without further delay. This he promised, but neglected, at the time, to do.

On the 16th of October, 1880, the premises having been put in condition for manufacturing purposes, were leased for the term of four years to the American Mills Company, a New York corporation, of which the husband was a stockholder, and the treasurer. In February, 1881, the company became financially embarrassed. Its condition having become known to William H. Garner, a brother of Mrs. Graeffe, he informed her that, in case of its insolvency, the property, standing in her husband's name, was liable to be taken for its debts. The husband was thereupon again requested by the wife to convey the property to her. In accordance with that request, he conveyed to Garner, by warranty deed, dated March 1, 1881, and recorded March 3, 1881. The latter, by deed, dated March 1, 1881, and recorded August 13, 1881, conveyed to Mrs. Graeffe. The consideration recited in each of these deeds was $48,910.94, the amount of the wife's money that had been expended by the husband in and about the property.

An execution was issued November 7, 1881, upon a judgment rendered in one of the courts of Rhode Island, in favor of the Fourth National Bank of New York against Albert J. Graeffe. This execution was levied November 15, 1881, on all the estate, right, title, interest, and property he had, on March 5, 1881, (the date of the attachment in the case,) in and to the property described in the deeds to him, Garner, and Mrs. Graeffe. At a sale at public auction under this execution, the

interest of Albert J. Graeffe, so levied upon, was purchased, February 28, 1882, by Christopher H. Shippee, for $499, and he received a deed from the sheriff. Mrs. Graeffe, by her attorney, forbade the sale, and gave notice that the property was her sole and separate estate. Subsequently, Shippee, by quit-claim deed, conveyed an undivided half of the estate purchased by him, as above stated, to Samuel W. K. Allen, one of the appellees.

On the 7th day of January, 1882, at public sale, under an execution upon a judgment rendered in one of the courts of Rhode Island, in favor of the Second National Bank of Providence, that bank became the purchaser, for $525, of all the right, title, and interest of Albert J. Graeffe in the above real estate and premises, on the 16th of March, 1881, and received a deed from the sheriff.

The Second National Bank, Shippee, and Allen having threatened to eject Mrs. Graeffe from the possession and enjoyment of the property, this suit was brought against them in the name of Graeffe and wife. A part of the relief sought was a decree cancelling the deeds under which they respectively claimed, and thereby removing the cloud created by them upon her title.

The answers controvert all the allegations of the bill that tend to show an equity in favor of Mrs. Graeffe as against the judgment creditors of her husband. The special grounds of defence were sustained by the court below, and are sufficiently indicated in the following extract from the opinion of the Circuit Judge, made part of the record:

" This is a case as disclosed by the evidence where a wife for years allowed her husband to do as he pleased with her property, calling him to no account whatever, and where no action is taken by her until he has become insolvent, and is about to make an assignment. Property is permitted to stand in his name for months after his wife has knowledge of the actual condition of the title, and credit is given the husband on the faith that he is the real owner. Where a wife thus permits her money or property to pass into her husband's hands and possession to manage as he sees fit, without any

promise by him to repay it, and persons are, for this reason, induced to give credit to the husband, it neither becomes impressed with a trust in her favor, nor does she become his creditor in respect of it so as to sustain a conveyance by him to her upon the eve of his insolvency as against his general creditors" — citing *Humes* v. *Scruggs*, 94 U. S. 22; *Wortman* v. *Price*, 47 Illinois, 22; *Hockett* v. *Bailey*, 86 Illinois, 74; *Besson* v. *Eveland*, 26 N. J. Eq., (11 C. E. Green,) 468.

Shippee and Allen by cross-bill asked a decree cancelling the deeds made to Garner and Mrs. Graeffe as clouds upon their title. By the final decree the original bill was dismissed, and the relief asked by the cross-bill was given.

It is stated in the brief of appellant's counsel that, pending the action below, she obtained a divorce *a vinculo* from her husband, and by a judgment of the Supreme Court of New York had resumed her maiden name.

*Mr. Alexander Thain* for appellant.

*Mr. J. Langdon Ward* for appellees.

The bill proceeds solely on the theory of a trust in A. J. Graeffe for his wife's benefit, and the consequent validity of the conveyance to her. The bill must fail therefore, if no trust be established.

It is true that in the answer to the cross-bill the complainants in the original bill have shifted their ground and claim that Graeffe was a debtor to his wife and that the conveyance to her was a conveyance in payment of the debt owing from him to her, and that in thus preferring one creditor over another Graeffe simply did that which the law permitted him to do. It is respectfully submitted, however, that in so far as the affirmative relief sought by the bill is concerned, this allegation, even if true, would be of no avail since nothing of the kind is alleged in the bill.

But were this otherwise, and were it proved that Mrs. Graeffe's money had been invested in this estate in such way as to be within the allegations of this bill, it would furnish no ground for relief upon it, for:

1. It is well settled that where a wife permits her money or property to pass into her husband's hands and possession to manage as he sees fit, without any promise by him to repay it, it neither becomes impressed with a trust in her favor, nor does she become his creditor in respect of it so as to justify and sustain as against his general creditors a conveyance by him to her upon the eve of his insolvency, in alleged repayment of it. *Humes* v. *Scruggs,* 94 U. S. 22; *Wortman* v. *Price,* 47 Illinois, 22; *Wilson* v. *Loomis,* 55 Illinois, 352; *Patton* v. *Gates,* 67 Illinois, 164; *Hockett* v. *Bailey,* 86 Illinois, 74; *Miller* v. *Payne,* 4 Ill. App. 112; *Grover &c. Sewing Machine Co.* v. *Radcliff,* 63 Maryland, 496; *Besson* v. *Eveland,* 26 N. J. Eq., (11 C. E. Green,) 468; *Roy* v. *McPherson,* 11 Nebraska, 197.

2. It being admitted that this estate in question was purchased with Mrs. Graeffe's full knowledge and consent at the time, for the purpose of enabling her husband to carry on business upon and with it, and that she learned as early as August, 1881, that the title stood in his name, but allowed it so to remain, and these debts to be contracted in that business until he became utterly insolvent, she is estopped from now claiming the estate as against these creditors. Their equities are superior to hers. *Sexton* v. *Wheaton,* 8 Wheat. 240; *Spaulding* v. *Drew,* 55 Vermont, 253; *Knowlton* v. *Mish,* 17 Fed. Rep. 198.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

In the court below it was contended in behalf of the plaintiffs that even if there were no agreement that the property in question should be taken in the name of the wife, there was nothing illegal or inequitable in preferring her to the amount of the husband's debt to her. Upon this point the court said: "The question of the legality of a preference under Rhode Island laws does not arise in this case; for our decision rests upon the principle that Mrs. Graeffe, by her own conduct or acts, by what she permitted to be done, or neglected to do,

is estopped in a court of equity from claiming this estate as against the general creditors of her husband."

We are of opinion, after a careful examination of the evidence, that there was nothing in the conduct or acts of Mrs. Graeffe that precluded the court from granting the relief sought by her. The case made by the bill was in all material particulars sustained by the proof. We do not see how this conclusion can be avoided, except by disregarding altogether the testimony of Mrs. Graeffe and her husband. And that we do not feel at liberty to do. In our judgment what they have said under oath touching the vital issues in the case must be taken as substantially true.

Mrs. Graeffe inherited from her father and uncle property, principally real estate, worth from $100,000 to $125,000. When the estates of the uncle and father were settled up, the moneys and securities belonging to her came into the husband's hands under a power of attorney, which authorized him to receive them for her. There is no claim, as under the evidence there could not be, that the wife made a *gift* of this property to her husband. On the contrary, it remained in his hands to be controlled for her, although he was allowed a large discretion in its management. The husband informed his wife that she could buy the property in question, stating that it could be purchased cheaply, and that a very fair return could be derived from it if improved and leased to the Mills Company. When it was concluded to make the purchase, the husband told the wife that he " would buy the property for her," and that " the title was to be vested in her." It is beyond question that she relied upon his assurance that the property would be secured to her. She certainly understood at the time, as was quite natural, that it was to be her property. The purchase was made in March, 1880. The husband, without the knowledge of the wife, and in violation of the assurances he had given her, took the title in his own name. The price paid was about $6000. Immediately after the purchase improvements costing about $40,000 were put upon the premises. The moneys paid for the property, and that expended for its improvement, belonged entirely to Mrs. Graeffe.

In August, 1880, the improvements being then in progress, she discovered, in the course of a conversation with her husband, that the property stood in his name. She grew excited about the matter, and insisted upon his making a conveyance to her at once. This he agreed to do. He promised that he would attend to it at once, but neglected to perform his promise. To these facts the husband testified, and we are not at liberty, upon a close scrutiny of the evidence, to doubt the substantial accuracy of his statements. Other testimony by him was to the following effect: "Q. After this interview in August, and before the conveyance, on the first of March following, had you any conversation with Mrs. Graeffe in which she was informed as to where the required title of the property was? A. What do you mean by that? Q. How did she know that it had not been conveyed to her? A. She questioned me from time to time and I was forced to make acknowledgments to her that I had not as yet attended to the transfer. Q. When did she first question you, after the interview of August, 1880? A. In that fall of 1880 and also in the spring. Q. When was it that you first told her that you had not transferred the title to her? A. August, 1880. Q. And then you told her you were going to do it? A. Yes. Q. After that when did you tell her you had not; or, did you tell her anything about it? A. Yes; I told her later, with a promise to do it, and failed to do it. Q. When next, prior to March first, 1881? A. Some time in February; I cannot tell the date, but it was at the moment when I was borrowing money from her to pay some drafts that were maturing. She then again learned that I had not made this transfer. I told her then, and she was very much excited about it."

Mrs. Graeffe testified to the following effect: "Q. At the time he had these conversations with you, was there anything said as to who was to take the property? A. I understood that it was to be my property. Of course, I understood it was to be my property. Q. Did you learn from time to time that purchase had been made of the property? A. Yes, Graeffe told me, and told me the price he could get, but I don't remember the figures at all. Q. What did you say

about purchasing? A. I left it to him. Q. What did you say to him? A. I expected that he would purchase, and talked to that effect. Q. When did you first learn that the title to the property was not in your name? A. About August of that year, I think. I think it was some time during the summer and we were talking about the property, and he gave me to understand it was not in my name. I then insisted upon it, and he said it should be put in my name. I know we had quite a little controversy at the time. He said if that would satisfy me, it should be put in my name. Q. When next did you have any conversation with Mr. Graeffe after this interview in August on the subject of the title to this property? A. I don't think we ever spoke of it again to speak of the title until he was about to fail. About that time I spoke to my brother about it, and that was the first I knew that it had not been put in my name. Q. What did you say to your brother? A. I asked him to look out for my interest, and get my money. He asked if it was mine. I said I thought it was. I then spoke to Graeffe, and he said it had not been put in my name. My brother said immediately it must be done. I think it was he who took charge of the affair.' Q. Immediately after this conversation, the transfer was made? A. Yes, I think it was the next day — just as soon as I could possibly make arrangements."

The brother of Mrs. Graeffe here referred to was William H. Garner, to whom the property was conveyed by Graeffe, and by whom it was immediately conveyed to the wife. He testified: "Some few days before the actual transfer Mrs. Graeffe, my sister, told me of the fact that this property belonging to her had been transferred to her husband, and asked me to insist on its being retransferred to her, and I did so." Under the deed from her brother, Mrs. Graeffe claims the property as against those who obtained sheriff's deeds under attachments issued and levied after the title was vested in her. These attachments, we have seen, were levied on the right, title, and interest of the husband in the property.

The proof fails to show that Mrs. Graeffe ever stated to any one that her husband owned the property, or that any

one in her presence ever spoke of him as its owner. There is some conflict in the evidence as to whether the husband represented to any creditor that he owned the property. He denies that he ever did, and we do not think the evidence authorizes us to assume that he made or intended to make any representations of that character. In any event, it must be taken that his creditors were not induced to regard him as the owner of the property by reason of any representations to that effect by, or with the knowledge of, Mrs. Graeffe.

The only omission charged against her in respect to the property is that she relied upon her husband's assurance that it would be put in her name, and did not, immediately upon learning in August, 1880, that he had deceived her, take steps to have the property conveyed to her, and thereby place herself before the public as holding the legal title. But is that omission sufficient to justify a court of equity in denying the relief asked? Let this question be examined first with reference to the law of the State where these transactions occurred.

It is provided by the statutes of Rhode Island that " the real estate, chattels real and personal estate, which are the property of any woman before marriage, or which may become the property of any woman after marriage, or which may be acquired by her own industry, shall be absolutely secured to her sole and separate use ; neither the same nor the rents, profits, or income of the same, nor any part thereof, shall be liable to be attached or in any way taken for the debts of the husband, either before or after his death, and upon the death of the husband, in the lifetime of the wife, shall be and remain her sole and separate property ; " further, " in case of the sale of any such property, the proceeds of such sale or any part of the same may be invested in the name of the wife, in any property, and be secured to and holden by the wife in the same manner and with the same rights and effect as the property sold." Pub. Stat. R. I. c. 166, §§ 1 and 2, p. 422. And, in that State, preferences of *bona fide* debts are permitted, except when they are assailed under the insolvent laws of that State, within the time limited by those laws. Pub. Stat. R. I. c. 237, §§ 14 and 15, p. 660.

In *Steadman* v. *Wilbur*, 7 R. I. 481, 486, which involved the validity, as against the husband's creditors, of a purchase alleged to have been made by the wife, with her separate estate, of property belonging to the husband, the court said : " If the title conveyed to the wife were a mere equitable one, resting in executory contract, a court of law could not set it up against a legal title by execution acquired by purchase from a creditor's levy and sale ; but where, as in this case, the wife's legal title has been perfected by deed, a court of law would deal, and ought to deal, with the wife's right to purchase, for a fair consideration, from her husband, precisely in the same way that a court of equity would. If this be so by the general law, how much more in this State, where, by statute, not only the wife's rights to her property are secured against her husband and his creditors, but her legal identity with respect to it, as a person distinct from her husband, is recognized, and her power to act and contract in the disposal of it, in the modes permitted by law, is acknowledged by legislative enactments." Observing that if the wife may contract with her husband at all for the purchase of his property with hers, it must be, in regard to his creditors, upon the same principle of good faith, and the giving of equivalent consideration, that any other purchaser might, and that if she loans him money, it must be with the same right to expect and receive security or repayment out of his estate, and even preferences of payment, that any other creditor has, the court proceeded : " She cannot, indeed, when her husband becomes insolvent, convert into debts, as against creditors, former deliveries to him of her money or other property, or permitted receipts by him of the income or proceeds of sale of her separate estate, which at the time of such delivery or receipt were intended by her as gifts, to assist him in his business, or to pay their common expenses of living ; and, considering the relation between them, the law would not, merely from such delivery or receipt, imply a promise on his part to replace or repay, as in case of persons not thus related ; but would require more, either in express promise or circumstances, to prove that in these matters they had dealt with each other as debtor and

creditor. It is not, however, as supposed, a rule of law that *at the time* of each delivery or receipt of the separate property of the wife by the husband, the latter must expressly promise to repay the former, or to secure her out of his estate, to constitute the relation of debtor and creditor between them in regard to it. Such a promise, made before such transactions, and looking forward to and covering them, would, at law as in common sense, avail as well to prove the character of them, precisely as it would between other parties who were dealing with each other on credit and in confidence. Nor is it true that an *express* promise to secure or repay out of the estate of the husband is requisite, in such a case, to prove that her husband received her separate property as a loan, and was therefore entitled, as against his creditors, thus to secure and repay her. Neither at law nor in equity is inferential proof to be rejected upon such a subject, more than upon any other, although, as suggested, what are proper inferences may be modified or altered by the relation between the parties."

In *Hodges* v. *Hodges*, 9 R. I. 32, 35, it was decided that husband and wife, if they choose to do so, could treat each other as lender and borrower, and that such a contract would carry with it the usual incident of interest, the same as with other parties. And it was held, in that case, that the wife was entitled to be credited in the account between her and her husband with the proceeds of the sale of her property, although they had been applied to defray family expenses with her consent and approval. In *Elliott* v. *Benedict*, 13 R. I. 463, 466, it was held that, subject to the limitations prescribed by the insolvent laws of Rhode Island — which limitations do not affect the present case — a debtor has the right to apply the whole of his property, subject to attachment, to the payment of any one of his debts in preference to others. The court said : "At common law it is no fraud for a debtor to pay in full any debt which he owes, out of any property he has, whether attachable or not, though the result, and even the *proposed* result, of the payment may be that other debts will have to go unpaid. And the common law in this regard is not affected by the statute of fraudulent conveyances."

And in *Franklin Savings Bank* v. *Greene*, 14 R. I. 1, 3, it was held that, in Rhode Island, a wife might acquire by purchase or gift from a third person the note of her husband, and enforce payment thereof as such third person might have done, she suing, if suit became necessary, by next friend in equity, or through a trustee of her estate appointed by the court on her petition under the statute. Alluding to the rule at common law declaring that the transfer of a note of the husband to the wife extinguished the debt, the court said: "The enactment, however, of statutes recognizing the separate existence of a married woman by securing her property to her exclusive use, as against the husband and his creditors, and by conferring upon her to a greater or less extent the power of entering into contracts respecting her property and of disposing of it independently of her husband, has changed the common law in this respect, where such statutes prevail. They two are no longer one, and *he* that one."

The general principles thus announced by the Supreme Court of Rhode Island are in accord with the decisions of this court. In *Magniac* v. *Thomson*, 7 Pet. 348, 397, this court said that, among creditors equally meritorious, a debtor may conscientiously prefer one to another, and it can make no difference that the preferred creditor is his wife. So in *Bean* v. *Patterson*, 122 U. S. 496, 500, which related to a conveyance of real estate by a husband for the benefit of his wife, and which conveyance was alleged to have been made in good faith to secure debts due to her for sums previously realized by him from sales of her individual property, the court said: "If, therefore, there had been no other consideration for the deed than a desire to secure for his wife provision against the necessities for the future, it could not be sustained. . . . That the property in Pennsylvania, deeds of which are mentioned above, was used for his benefit, and to pay and secure his debts, is sufficiently established. The amount realized therefrom, as we read the evidence, was greater than the sum named in the trust deed as due to her. That deed for her security stands, therefore, upon a full consideration. Had it been given to a third party for a like debt it would not be

open to question that it would have been unassailable.    The result is not changed because the wife is the person to whom the debt is due and not another.    While transactions by way of purchase or security between husband and wife should be carefully scrutinized, when they are shown to have been upon full consideration from one to the other, or, when voluntary, that the husband was at the time free from debt and possessed of ample means, the same protection should be afforded to them as to like transactions between third parties."    To the same general effect are numerous cases: *Jewell* v. *Knight*, 123 U. S. 426, 434, and authorities cited; *Stickney* v. *Stickney*, 131 U. S. 227, 238, 240.    In the latter case it was said that "whenever a husband acquires possession of the separate property of his wife, whether with or without her consent, he must be deemed to hold it in trust for her benefit in the absence of any direct evidence that she intended to make a gift of it to him."

Applying the principles recognized by this court, as well as by the highest court of the State in which the property in question is situated and where the transactions in question occurred, we hold that Mrs. Graeffe is entitled to a decree cancelling the deeds under which the defendants claim the property described in the deed to her.    That her husband was without any means of his own and had in his possession, substantially, the entire estate of his wife, controlling and managing it for her; that the property in question was purchased and improved wholly with her money under an explicit assurance by him, before the purchase was made, that it would be put in her name; that she relied upon his compliance with that promise; that the husband, on the 1st of March, 1881, owed her a larger sum than the amounts expended in purchasing and improving the property; that the conveyance to Garner, in order that he might convey to Mrs. Graeffe, was made in good faith, for the purpose, and only for the purpose, of satisfying, to the extent of the value of the property conveyed, the debt due to the wife; and that no one became a creditor of the husband in consequence of any representation made by her, or with her knowledge, that he owned the prop-

erty, are all facts clearly established by the evidence. Why should not the wife be protected under these circumstances? If the husband, in fact, had owned this property, and, in order to prefer a part of his creditors, had, in good faith, sold and conveyed it to them, with the intent to give a preference over other creditors, the right of such grantees to hold it, unless the case was brought within the insolvent laws of the State, could not be questioned. No different rule should be enforced in this case against a wife who has received a conveyance of property purchased with her money, and which should have been put in her name when so purchased. By no act or word, upon her part, was the husband discharged from the performance of his agreement to put the property in her name. The conveyance to Garner, followed by his conveyance to her, was executed for the purpose of discharging the husband's obligation to the wife, and was made before any creditor acquired a lien upon the property by attachment. As between the husband and wife, a court of equity would have compelled him to secure this property to her. If, before any rights of attaching creditors intervened, he did voluntarily what the law made it his duty to do, the transaction is not subject to impeachment by his creditors, unless the wife has been guilty of such fraudulent conduct as ought, in conscience, to estop her from claiming the property as against such creditors. If the wife had herself been guilty of deception, or if she had contributed to its success by countenancing it, she might, with justice, be charged with the consequence of her conduct. *Sexton* v. *Wheaton*, 8 Wheat. 229, 240. But the evidence furnishes no ground for the imputation of fraud against her. That she relied upon the husband's promise to purchase the property for her and invest her with the title, and that she again relied upon his assurance, given in August, 1880, that he would have the property conveyed to her, are circumstances that do not affect the substance or good faith of the transaction. She acted with all the diligence that could reasonably have been expected or required under the circumstances. She supposed that he kept an accurate account of all transactions involving her estate as managed by him, and had no purpose to give

him a false credit before the world. As subsequent developments showed, she erred in relying upon the assurances and promises of her husband as much as she appears to have done. But, as fraud cannot be imputed to her, a court of equity ought not, for such an error, to deprive her of that which is justly hers.

The cases cited in the opinion of the court below rest upon a state of facts wholly different from those here presented. For instance in *Humes* v. *Scruggs*, 94 U. S. 22, 27, 29, which was a suit by an assignee in bankruptcy to set aside a conveyance of real estate made by a bankrupt to his wife as being in fraud of the rights of creditors — the wife alleging in her answer that the land was purchased by the husband with her money and that she believed for years that the title had been taken in her name — the court found that the proof showed a state of case the reverse of that claimed by the wife. It said : " Neither the husband nor the wife testified that there was any agreement that the husband should hold these sums as and for the estate of his wife, or that when the property in question was purchased it was agreed to be held as her estate. On the contrary, the moneys were held and used by the husband for nearly fifteen years as his own property, and mingled with his personal and partnership affairs. . . . But it is probably untrue, in fact, that this land was bought for her, as she alleges in the answer, or that she believed at any time that the title was taken in her name. . . . If the money which a married woman might have had secured to her own use is allowed to go into the business of her husband and be mixed with his property, and is applied to the purchase of real estate for his advantage, or for the purpose of giving him credit in business, and is thus used for a series of years, there being no specific agreement when the same is purchased that such real estate shall be the property of the wife, the same becomes the property of the husband for the purpose of paying his debts. He cannot retain it until bankruptcy occurs and then convey it to his wife. Such conveyance is in fraud of the just claims of the creditors of the husband." The observations of the court in *Humes* v. *Scruggs* have no application to the facts

that we consider to be established by the proofs in the present case. The difference of opinion between this court and the Circuit Court arises chiefly from the conclusions of fact to be drawn from the testimony.

In our judgment, the court should have dismissed the cross-bill and given to Mrs Graeffe the relief asked by the bill.

*The decree is reversed and the cause remanded for further proceedings, in conformity with this opinion.*

MR. JUSTICE BROWN was not present at the argument, and took no part in the decision of the case.