### SMITH ET AL. *v.* VODGES, ASSIGNEE.

In order to defeat a settlement by a husband upon his wife, it must be intended to defraud existing creditors, or creditors whose rights are expected shortly to supervene, or those whose rights may and do supervene.

APPEAL from the Circuit Court of the United States for the Eastern District of Pennsylvania.

*Mr. N. H. Sharpless* and *Mr. Richard C. McMurtrie* for the appellants.

*Mr. William A. Manderson* for the appellee.

MR. JUSTICE SWAYNE delivered the opinion of the court.

The law of this case is too well settled to admit of doubt. In order to defeat a settlement made by a husband upon his wife, it must be intended to defraud existing creditors, or creditors whose rights are expected shortly to supervene, or creditors whose rights may and do so supervene; the settler purposing to throw the hazards of business in which he is about to engage upon others, instead of honestly holding his means subject to the chance of those adverse results to which all business enterprises are liable.   *Sexton* v. *Wheaton*, 8 Wheat. 229; *Mullen* v. *Wilson*, 8 Wright, 413; *Stileman* v. *Ashdown*, 2 Atk. 481.

Fraud is always a question of fact to be determined by the court or jury upon a careful scrutiny of the evidence before it.

The view which we take of this case renders it unnecessary to consider the objections urged by the counsel of the appellants against the reference to the master, the exceptions to the master's reports, and the questions raised by the demurrers to the original and the amended bill.

Passing by these subjects, and looking only to the merits of the controversy, two points to be examined arise. They involve questions of fact which must be solved in the light of the evidence found in the record. The burden of proof rests upon the appellee.

1. What was the pecuniary condition of the bankrupt when the property in question was bought at the sale under execution, and conveyed by the sheriff to Esther A. Smith?

The date of the transaction was the 2d of June, 1862. The amount paid was $1,450. The property consisted of a dwelling-house and store-room, which she had leased in the year 1859. The rent was $150 per year. She and her husband occupied the premises up to the time of the sale. She kept a dry-goods store and a millinery and dress-making establishment in her own name. She was eminently successful. The bill avers and admits, that, at the time of the purchase of the property, she had realized profits to the amount of $10,000, and that the property was paid for out of this fund. There is proof in the record to the same effect. In conducting her business, she paid promptly; and it does not appear that she then or subsequently owed any thing which is unpaid. The husband had paid all his debts except two. For those he had given extension notes, having short times to run; and they were paid at maturity.

This investment for the benefit of the wife was never challenged by any creditor of the husband or the wife; and it is not now challenged in behalf of any creditor whose debt subsisted then or accrued for a considerable time afterwards. Under the circumstances, the investment was moderate in amount, proper to be made, and, we think, liable to no legal objection as to its validity. The testimony to be considered in connection with the next point throws a backward light, which is also favorable to the wife with respect to this part of the case.

2. What was the pecuniary condition of the bankrupt when he extinguished the ground-rent by which the property was incumbered?

The money was paid about the 1st of January, 1866; and the amount was $3,000.

After the 1st of January, 1863, the business, which had before been carried on in the name of the wife, was conducted in that of the husband. It continued to be prosperous for several years. He thinks he made from $10,000 to $15,000 a year. He sold the first year from fifty to sixty thousand dollars' worth of goods. Such is his testimony, and it is uncontradicted. He paid all his debts, and considered himself in independent circumstances. His standing was such, that he had no difficulty in buying goods on credit. A merchant says, "His credit was good. I was willing and anxious to sell him all the goods I could" (Corbin's testimony). The cashier of the Fourth National Bank, speaking of his credit in that institution between the years 1864 and 1868, says, "He was able to get all he asked for, which was the greatest amount at one time, $5,000, only on account of his average good balance in bank" (McMullen's testimony).

No debt now exists which existed prior to 1868; and there is none now existing which can be said in any sense to stand in renewal or continuity of any such prior debt.

In the early part of 1867, there was a marked reflux in the tide of prosperity throughout the country. It swept many of those exposed to it into hopeless insolvency. The bankrupt became embarrassed and depressed. His wife proposed to relieve him by making a loan of $4,000, to be secured by a mortgage upon the property in question. This suggestion was carried out. The loan was made and the mortgage given in March, 1867. The money was paid over to his creditors. This enabled him for a time to weather the storm. But times grew worse. The shrinking in the value of dry-goods was immense. He testifies that muslins for which he paid seventy cents per yard he was compelled to sell for twenty.

His loss by shrinkage he estimates at $20,000. In 1868, when his stock had been reduced in value to about $20,000, he sold it for that sum to the clerks, all females and relatives, who

had been employed in the store, and took their notes accordingly. These notes he indorsed to his creditors. Some of them have been paid, and others not. When the stock in the hands of the vendees had been reduced to a remnant, worth about $2,000, it was sold under process in favor of his wife for the payment of the accumulated rents due to her.

The mortgage to secure the loan of $4,000 is still unsatisfied.

The bankrupt testifies that his failure was due to the losses of a firm of which he was a member; and that, but for that connection, he would still be in prosperous circumstances.

We think the payment of the $3,000 to extinguish the ground-rent was honestly made, and was warranted by the condition at that time of the bankrupt's affairs. They were then prosperous, and he had no reason to anticipate the reverses which followed. If there could otherwise be any doubt as to the integrity of this transaction, it is removed by the loan and mortgage and the application of the money borrowed. If there had been a purpose to defraud when the property was bought or the ground-rent extinguished, the mortgage would not have been given. It is entirely inconsistent with such an idea. The loan replaced the amount paid for the ground-rent, with an excess of $1,000; and it equalled the amount paid for both the property originally and in extinguishment of the ground-rent, less $450.

We hold the transactions both as to the ground-rent and the original purchase to have been honest and valid.

Where money has been misappropriated, the general rule of equity is, that those wronged may pursue it as far as it can be traced, and may elect to take the property in which it has been invested, or to recover the money. *Piatt* v. *Oliver*, 3 How. 401.

Lord Ellenborough held that the same rule is applicable at law. *Taylor* v. *Plummer*, 3 M. & S. 562.

It was claimed by the counsel for the appellants, that, if the transactions here in question should be adjudged fraudulent, the assignee would only have a lien upon the premises for the amount to which it might be held he was entitled with interest.

The conclusions at which we have arrived upon the facts render it unnecessary to consider the law of the remedy.

*Decree reversed, and cause remanded, with directions to dismiss the bill.*