WESTERN UNION TEL. CO. et al. v. AMERICAN BELL TEL. CO.

(Circuit Court of Appeals. First Circuit. October 6, 1903.)

No. 398

1. EQUITY JURISDICTION—SUIT FOR ACCOUNTING UNDER CONTRACT CREATING TRUST RELATION.

By the contract between the Western Union Telegraph Company and the American Bell Telephone Company, dated November 10, 1879, the two corporations consolidated their interests in the telephone business; the first-named corporation transferring its interests to the second-named corporation, which it was agreed should control the combined whole, paying the first-named corporation a certain percentage of all rentals or royalties received. *Held*, that the contract established between the parties a relation in the nature of a trust, which required the American Bell Telephone Company to account and pay according to the principles of equity, and gave a court in equity jurisdiction with reference to the subject-matter in behalf of the Western Union Telegraph Company.

2. CONTRACT—CONSTRUCTION—RENTALS OR ROYALTIES FROM TELEPHONES.

A contract was entered into by complainant and defendant, both being corporations owning patents relating to telephones over which litigation was pending between them, and engaged in operating telephone lines and in leasing telephones for use by others, by which complainant conveyed to defendant all its business, and its patents and rights thereunder, in consideration of which defendant agreed to pay to complainant upon all telephones used in the United States under any license granted by it, unless expressly excepted, "a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid in accordance with the provisions of the contract from licenses or leases for speaking telephones." It further provided that certain stated rates were "recognized as the present standard rates of gross royalties or rentals," and that such rates of charge might be increased by defendant at pleasure, but should not be lowered without complainant's consent, any increased rate, while in force, to be taken as the gross rentals or royalties in respect of the telephones for which they were obtained. *Held*, that under the circumstances the phrase "rentals or royalties actually received or rated as paid" covered gross sums received by the American Bell Telephone Company for perpetual or other exclusive licenses under the patents embraced in the contract, for which sums it gave no consideration, except such licenses.

3. REFERENCE—MASTER IN CHANCERY.

The rule of Kimberley v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 32 L. Ed. 761, with regard to special references to masters in chancery, considered.

4. CONTRACTS—CONSTRUCTION.

The rules with reference to the effect to be given to prior negotiations and other extrinsic circumstances, in construing complicated contracts of many years' standing, considered and applied.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 105 Fed. 684.

Josiah H. Benton, Jr., and Rush Taggart (John F. Dillon, on the brief), for appellants.

John C. Gray and Richard Olney (Charles H. Swan, on the brief), for appellee.

Before PUTNAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

PUTNAM, Circuit Judge. There are several parties to the record, and several other parties have been predecessors in title; but, as the sole beneficial issue is now between the Western Union Telegraph Company and the American Bell Telephone Company, we will find it necessary to name only them. The bill was brought for an accounting under a contract dated November 10, 1879, between the Western Union Telegraph Company and corporations in the same interest and the National Bell Telephone Company, the predecessor in interest of the respondent. It was filed on November 16, 1883. Without waiting for a hearing, on May 24, 1886, the case was sent to a so-called master under the following agreement:

"It is agreed that the above-named cause may be referred to the Honorable John Lowell, as master, to hear the parties, report the facts, with such part of the testimony as either party shall request, and his rulings on any question of law arising in the case."

The reference fell within the rule of Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 32 L. Ed. 761, and of subsequent cases of that class. Frequently such references involve troublesome complications through the fact that they necessitate departures, more or less definite, from the ordinary practice. In the present case, however, no difficulty arises. The complainants excepted to the master's report solely as to questions of law. The respondent took no exceptions. We should explain that there are some findings of the master which take the form of findings of fact, but which are really findings of law, as they arose on the face of the various papers in the case. Therefore, we are not embarrassed on account of the agreement for reference by Kimberly v. Arms or by other cases of that class.

The master found for the respondent, and the Circuit Court sustained his findings, and entered a decree dismissing the bill. We think that we should first make clear what the true issue is. The contract obligated the telephone company, among other things, to account to the Western Union for a certain percentage of rentals or royalties for the use of telephones protected by certain letters patent. At the time of the execution of the contract there were three ordinary methods of using telephones: First, on private lines; second, on lines from one part of a building, or premises, to another part thereof, ordinarily known as "speaking-tube" purposes; and, third, in exchange systems or the like thereof. Then the telephone company not only owned and licensed telephones, but also had certain interests in exchange systems. The master, among other things, reported:

"I am of opinion that by the contract the defendant clearly had the exclusive right to carry on the exchange business, alone or jointly with others, and to receive its profits, paying to the plaintiffs twenty per cent. of the stated rentals."

It is clear that the Western Union had, under the contract, no interest in the exchange business which the telephone company owned, in whole or in part, or in the profits received therefrom, so far as either can be distinguished from considerations for the mere licensing of telephones, or so far as the advantages which came from them to the telephone company came as the result of a contribution by it

aside from that of such mere licensing. It is also clear that when, even after the contract of November 10, 1879, the telephone company had properly acquired any part of an exchange, the complainants had no interest in the subsequent profits which might come therefrom. The position of the complainants before us renders it unnecessary to elaborate these propositions. They put the case on a single issue in the following language, which refers to certain shares of corporate stock which the complainants maintain the telephone company received as part consideration for licenses to rent and use telephones:

"It is in respect to these shares thus received by the Bell solely for exclusive licenses to use telephone instruments under the patents which were by the contract combined in its hands, and by virtue of which contract alone the Bell was able to give such licenses, that this suit seeks an accounting."

This claim is illustrated by the following finding by the master:

"The shares, of which the plaintiffs require one-fifth to be accounted for, were, in nearly all cases, obtained in the way to be presently mentioned, but reference may be had .or their terms to the contracts reported herewith. The defendant issued to a corporation a license to use telephones for five years in an exchange to be established by and at the expense of the licensee in a certain place, paying the usual rentals, and reserved the right to take the plant at actual cost, less depreciation at the end of the term, allowing nothing for franchise or good will. These short-term contracts either expired or were surrendered by the licensees, and thereupon the defendant gave them perpetual exclusive licenses for the agreed locality, and received these shares, usually thirty-five per cent. of the entire capital stock, for which it paid nothing except the exclusive perpetual license."

This renders immaterial a considerable portion of the master's findings of the proofs in the record and of the propositions urged on us by the respondent. It especially renders it unnecessary that we should consider the proposition urged by the respondent that there is a substantial distinction between a "rental of telephone instruments" and the "profits of an exchange business," or that we should follow out any elaboration of the definitions and expressions in the contract, showing that the word "telephone" is used therein with the utmost precision. In the same manner, we are relieved from considering the respondent's illustration of its proposition that the contract had no intention that the Western Union "should share in the whole profits due to the telephonic patents," if that expression has any peculiar significance, or the further proposition that it was contemplated that some exchanges would make larger charges, and, consequently, have larger profits, than others. It also renders unnecessary any consideration, at least at this stage of the case, of the peculiar relations of the contracting parties to exchanges at the date of the contract or prior thereto. It is plain that the only question before us is whether the Western Union may share in valuable assets received in lump by the telephone company in exchange in the whole or in part for telephone licenses.

The parties have not urged on us any question of jurisdiction in equity, but it naturally arises in connection with that of the substantial merits of the case. The record shows that the accounting, if the complainants are entitled to it, would be so voluminous and com-

plicated that it would be impossible to take it at common law, unless by the technical action of account, if it would lie. That this fact affords sufficient ground for jurisdiction in equity, whether that action would lie or not, is well settled. Some of the authorities bearing thereon are cited and explained in Fenno v. Primrose (C. C.) 116 Fed. 49. In addition, the nature of the rights vested in the Western Union by the contract in issue here supports this jurisdiction. It will appear that the contracting parties combined substantially all their interests in telephonic patents, to be worked by the telephone company for their joint benefit, certain net results to be shared on an agreed percentage. While this did not create the technical relation of trustee and cestui que trust, it established a quasi trust, such as between copartners, and between the officers of a corporation and the corporation, over which chancery takes jurisdiction.

It is not necessary to set out with great fullness the contract in issue. It has been abstracted in the opinion of the learned judge who heard the case in the Circuit Court, and a general statement of its purview with reference to the topics which bear on the question at bar will be sufficient. The respondent has very well stated its general features in substantially the following language: The Western Union, a well-established corporation with a large capital, controlling continental telegraphing, was also, previous to and at the time the contract was made, carrying on a more or less extensive telephone business. The telephone company, then a comparatively new and small corporation, was wholly engaged in telephones, and, by virtue of its patents, claimed an exclusive right. Numerous suits were pending for a determination of the respective rights under the several telephonic patents owned or controlled by the parties. The Western Union desired to protect its telegraphic business against possible inroads by telephones, and, under those circumstances, a compromise was reached, and this contract was executed. Its principal features are carefully framed provisions for the protection of the Western Union telegraphic system, and a lease and transfer by it to the telephone company of its interests in the telephonic patents, its telephones and telephonic exchanges, with an agreement that the Western Union should receive a certain proportion of the rentals or royalties which should come to the telephone company. It should be added that, as incidental thereto, the telephone company agreed to keep accounts of the number of telephones manufactured, licensed, and put out for use, and of the rentals received therefrom, which should be open to the inspection of the Western Union, for the purpose of ascertaining the "royalties or bonus" coming due under the contract.

The contract is long, and contains a great many provisions, and, therefore, of course, many of its expressions are oftentimes repeated, and not always exactly in the same form. As the contract was made so long ago, it was, perhaps, constructed in the light of facts the common recollection of which is now dimmed, leading to a strong anxiety on the part of one or both parties to the controversy to restore them, for the purpose of sustaining their respective views pro and con. The result of this is a voluminous mass of proofs rela-

tive to prior negotiations, correspondence, and earlier contracts, to which much weight was given by the master and the Circuit Court. Against this the Western Union earnestly objects.

To some extent it is the same with a contract as with a statute. The court upon which rests the burden of construing it, especially if it is ancient and complicated, searches carefully for any scrap which may suggest an interpretation not obvious after a lapse of time. While nothing such can be availed of for the purpose of overruling the intention of the parties as finally incorporated in the executed instrument, yet, as said by Judge Aldrich, in speaking for the Circuit Court of Appeals for this circuit in Church v. Proctor, 66 Fed. 240, 242, 13 C. C. A. 426, an interpretation of writings is to be made "with reference to the subject-matter and the understood situations of the parties." The circumstances under which contracts are executed, and the difficulties of understanding the actual relations with which parties are dealing, vary so much that no absolute rule can be framed as to the methods in which courts may investigate them; but the practice is so liberal that Greenleaf on Evidence, vol. 1, § 282, an authority which we need not go beyond, says that "the rule excludes only parol evidence of the language of the parties, contradicting, varying, or adding to that which is contained in the written instrument." On the other hand, extreme care is required in making investigations into a field beyond what was clearly appropriated, because of the fact that such investigations may not only mislead, but they may draw courts into speculations and doubts more involved than those arising on the face of the contracts concerned.

In the present instance, what is known as the "Ormes Contract," and also the "Outline"—that is, a preliminary draft—and other drafts, have been much relied on by the respondent; but one will be shown to have been based on radically different principles, so far as the problem before us is concerned, while as to the various drafts the chasm between them and the completed instrument is so broad that nothing in the record enables us to bridge it. We will explain this more at length hereafter.

Among other elements, the existence of which is much discussed, is that of exchanges; but their existence is so emphatically recognized by the contract, and so extensively provided for, that whether at the time of its execution there were few or many, whether in use by one party or both, and whether subsequently greatly multiplied or not, must be regarded as in all respects understood and anticipated contingencies. The same is true with reference to nearly all the other incidents which have been brought to our attention with great detail. The recognition of most of them by the contract itself is so positive that it will be necessary for us to refer to them only briefly, if at all, except as they appear therein.

In contemplating the construction and effect of the contract, we must first of all consider that the relations of the parties to it were of the fiduciary character to which we have referred; so that the telephone company, as the sole holder of the joint interests, left in exclusive control thereof, was bound to the underlying rule that neither directly nor indirectly, nor by any artifice whatever, should

the Western Union be deprived of its share in the net profits of the licenses or leases, whatever form they might assume, unless and except as expressly so provided. In Batchelder & Lincoln Company v. Whitmore (C. C. A.) 122 Fed. 355, 361, we illustrated how such fiduciary obligations may arise between others than technical trustees and cestuis que trustent, pointing out that the utmost good faith is required between creditors coming into a composition of a failing debtor. The existence of similar obligations under other circumstances, as between copartners, and also as between officers of a corporation and the corporation, is explained in Pomeroy's Equity Jurisdiction, §§ 157, 1088, and sequence, although it is shown that under such circumstances jurisdiction in equity does not lie to the same extent as with technical trusts. It is also true that, other than with a technical trustee, this contract left a large discretion with the telephone company, and did not bind it to any particular rule of diligence or skill. Nevertheless, this general equity requires it to account with the utmost good faith for what concerns the common interests. This equity is effectual, universal, and unyielding, and we must approach the contract in the light of it, and give the Western Union the full benefit thereof.

The contract in suit took effect as of November 1, 1879, and ran for 17 years. It covered the whole United States, with sundry exceptions, which need not be named here. The Western Union and corporations it represented are described in it as the party of the first part, and the telephone company as the party of the second part. The contract opens with a requirement that the telephone company pay to the Western Union "upon all telephones used in the United States under any license" from the telephone company, "unless expressly excepted, a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid, in accordance with the provisions of the contract, from licenses or leases for speaking telephones." Article 1, par. 1. It then provides for a deduction of certain allowances, which does not trouble us. It then proceeds as follows:

"Concerning the sum which is to be taken as the gross rental or royalty for the purpose of the preceding article, it is declared and agreed" "that ten dollars per annum for each telephone, where only one is used at a terminal or station, and fifteen dollars per annum for a pair of telephones composed of an instrument used for sending and another instrument used for receiving, used at one terminal or station, are recognized as the present standard rates of gross rentals or royalties."

The contract provides that the telephone company may raise the rentals or royalties without conference with the Western Union, but it prohibits the lowering of them without its consent, except as the result of an arbitration, the details of which we have no occasion to explain. It should be said in this connection that the contract makes special provision for telephones which might be exported and sold abroad, but that, aside from this, the uniform practice of both parties to the contract, if not their universal practice, was, and had been, not to sell telephones, but to lease for annual rentals. The master reported that "the rentals had come to be nearly uniform in the dif-

ferent classes of business at about the rates mentioned in the contract." It appears, however, by the answer that the rentals and royalties named in the contract had ever since been the same, with the exception that the price for a pair of telephones had been raised to $20. We do not find that there is any dispute arising out of this fact, but we speak of it because it illustrates a proposition as to which there should be no question made before us. There is no pretense whatever for any claim to the effect that the word "rated," or the word "standard," or any other word or expression in the contract established a fixed license fee, so far as the relations between the parties to this litigation are concerned. Numerous paragraphs, some of which we will refer to hereafter, expressly provide for increasing the rates, and for the Western Union sharing in such increase. The word "standard" could hardly be justly construed as leading in any other direction, and, if it could be, the context would show that it was merely an unfortunately chosen word, overruled by various other portions of the contract.

Every word contained in the following expression in the first paragraph of article 1, namely, "all rentals or royalties actually received or rated as paid," etc., can have, and should have, its full effect. The words "actually received" relate to whatever may come in hand, whether on the basis of the "present standard rates," or from licenses for which more than the "present standard rates" might be paid. Therefore it is useless to contend that the contract contemplated any fixed sum as a maximum which the Western Union must be content with, while, on the other hand, the expression which we have just cited from the first paragraph of article 1 was entirely in its interests, giving it the minimum named license rate, even if the telephone company sold licenses below that rate, except as provided in the contract, and also giving it the benefit of all rentals or royalties received in excess of that rate, whatever the excess might be.

A large portion of the case as submitted to us concerns the meaning of these words "rentals" and "royalties." The respondent claims that they are used interchangeably, and that neither adds anything to the other. The word "rentals" would naturally fall into the contract, because, as we have said, the business had uniformly gone on the basis of a fixed amount for each year for the use of each telephone, and the word "royalties" naturally occurs in any contract of the general character of that at bar. The use of words of this character, which so naturally, and almost inevitably, fall into any contract with reference to patented matters, comes short of requiring any inference of special value. These words appear frequently in the contract; the respondent says 33 times, and states that the contract is not uniform in using both expressions. But departures of this character are frequently of the scrivener only, and, in any view, such a fact is too easily accounted for to meet the effect of the positive language with which the contract opens.

Royalties are commonly understood as meaning something proportionate to the use of a patented device; in other words, a kind of excise. Bouvier's Law Dictionary, "Royalty." In its more ordinary meaning, it would not literally include the shares of stock for which

an accounting is demanded.   In some of its uses it is a broader word than "rentals," and yet in other aspects "rentals" is a broader word than "royalties."   Rentals in their ordinary signification are not limited as royalties in their ordinary signification; that is, to something proportionate to the use of the patented device.   The word "ordinarily" means specific sums paid annually, or at other stated periods, for the right to use a patented device, whether it is used much or little or not at all.   We will show before we close that in the present case it is capable of an adaptation to meet in any view the literal construction which the respondent puts on the contract at bar.

On the whole, this expression in the first paragraph of article 1, "all rentals or royalties actually received or rated as paid," is, on any method of construction, whether literal or otherwise, flexible, and favorable to the complainant; but, after all, the fundamental rules of construction which we have said apply to this contract cut under this refined discussion as to the literal meaning of particular words and phraseology.   This will appear from a hypothetical case: Admitting that these parties, or any other parties, had stipulated literally and expressly for the payment and receipt of a share of annual rentals, springing out of the use of a patented device covering the entire United States or any limited district, and admitting that under those circumstances the party in whom the title to the patent vested had granted a perpetual license for a gross sum of money, abandoning the collection of annual rentals, or thus, for a like gross sum, had disposed of the entire or partial interest in the patent for the whole or a part of a district served, so that the collection of annual rentals was no longer practicable, either wholly or in part, as the case might be, it would be preposterous to maintain that thereby the party entitled to share was cut off from his rights under the contract.   It might well be that the contract could be so framed that he might bring an action in the nature of an action of tort for such disposition of the patented interest, but in no event would his rights be thus limited. Indeed, even at the common law, the precise kind of return described would be regarded as merely illustrative, and an action would lie at the option of the party entitled to share in whatever was in fact realized; and this result would be more marked in a suit in chancery, like this, where the proceeds of a beneficial interest can be followed by the party entitled to that interest, whatever form they take.   This rule was fully explained by us in Hutchinson v. Le Roy, 113 Fed. 203, 206, 51 C. C. A. 159, and it is laid down broadly in the following terms in Smith v. Vodges, 92 U. S. 183, 186, 23 L. Ed. 481:

"Where money has been misappropriated, the general rule of equity is that those wronged may pursue it as far as it can be traced, and may elect to take the property in which it has been invested or to recover the money."

While the court here speaks of "money," yet this word is only illustrative.   Like the other equitable rule to which we have referred, this one is also efficient, far-reaching, and absolute; so that beyond all question, in view of the equitable obligations resting on the telephone company which we have described, and even under the rules of the common law, contracts of this character must be so construed and applied that the portions of the present contract which we have cited

compel the telephone company to account for the shares of stock for which the accounting is asked, under the circumstances stated by the master, precisely as it would be required to account for any gross addition to rentals which it might have received in the form of a sum of money, unless something can be found in the contract which shows that the parties have stipulated otherwise. The underlying equities which we have described are so strong that they are not lightly to be set aside, nor can they be ignored on account of mere inferences ingeniously drawn from circumstances, or from anything except what appears clearly on the face of the contract or what is clearly inconsistent with the operation of its provisions.

At this point it is convenient to say what we need to say as to the Ormes contract. The respondent claims that this was the "basis" of the contract in suit. The master so found, and the Circuit Court sustained this finding. This is a remarkable illustration of the care which we have said should be used with reference to the investigation and application of matters outside of a contract itself. The foundation for this proposition is the testimony of Mr. Forbes, then president of the telephone company, as to a conversation with Mr. Gifford, then one of the counsel of the Western Union. The Ormes contract was completed in August, 1879. It constituted an arrangement between the Western Union, the telephone company, and Ormes, by which Ormes was licensed for several Southern states by both the other parties, and was able, therefore, to cover those states without controversy. Mr. Forbes testifies that he met Mr. Gifford at New York, and the suggestion was then made that the Ormes contract would be a good basis for a settlement for the rest of the country, "to which Mr. Gifford immediately expressed his opinion that it would," following which there was a discussion as to the method of making the suggestion practicable. What this conversation probably meant appears from the testimony of Mr. Gifford. While at the White Mountains, a short time before, he endeavored to arrange with the counsel for the telephone company for a combination of all interests into a joint property, in which each party should have a half share, looking to a corporation for that purpose. This was refused, and those negotiations failed. In other words, when Mr. Gifford assented to the suggestion of the Ormes contract as a basis, it satisfies the proofs to assume that he did it as an expedient in lieu of the proposition which he had made for the combination of the joint properties into a corporation. So far as that particular was concerned, the present contract did follow that with Ormes. While, also, in many details, the instrument before us follows the other, as it inevitably would, yet, as to the only question on this appeal, the principle underlying one is in contrast with that underlying the other. Ormes was the paymaster. He stipulated directly with the Western Union to pay it a fixed annual rental of $1 for each telephone, with a reduction under some circumstances to 75 cents. So far as the Western Union was concerned, he agreed to pay it this fixed license. That was the end of it, and he was under no further obligation to it, legally or equitably. The relations between the Western Union and the telephone company in the Ormes contract were of the simplest character. They, of

course, protected the telegraphic business of the former, but beyond that the telephone company made no stipulations in favor of the Western Union, except with reference to a certain incidental right which the telephone company reserved to increase its royalties as against Ormes, in case of additional cost to itself arising out of improvements. It indeed stipulated that under certain contingencies it would assume the royalties which Ormes agreed to pay the Western Union, but it did this only as a substitute for Ormes. In its essence, the Ormes contract is so far removed from the contract before us that we are unable to find in it any assistance of value.

We will also in this connection dispose of what we have to say with reference to the drafts preceding the contract as executed. First was what is called the "Outline." Precisely in what stage of the negotiations this came in we have not been advised. What purports to be a copy of it was obtained for this record, but a note by the clerk says that it was omitted when the case was printed for the master "because of the difficulty of properly reproducing it." It was covered with pencilings, and was altogether in the most confused and uncertain form. It, however, is plain that it did not contain the parts of the third paragraph of article 2 of the existing contract, which will be found to be necessary to the ultimate determination of the issue before us. The record also contains a paper dated on the 27th of September, 1879, signed by the parties as a memorandum to be replaced by a formal contract to be prepared by counsel. This also fails to contain the most essential part of the third paragraph of article 2; also the seventh paragraph of the same article, which we will explain further on. It is true, for whatever it may be worth, that the substance of this paragraph is found in the general phraseology of the memorandum of September 27th. No clear proposition is based on any of these preceding drafts; and, indeed, none could be, except that the mass of papers in the record relating to the prior negotiations shows that they were in a state of flux till the contract was completed. These extraneous drafts illustrate most vividly a proposition most pertinent to this topic at the outset of any discussion of it, that it sometimes happens that the minds of contracting parties meet on essentials only at the last instant, and this in such way that the final agreement finds no expression except in what was written last of all. On the whole, the contract before us exhibits on its face sufficiently for present purposes the existing condition of things; and, aside from what is disclosed by it and things of common knowledge, the matters which have been so elaborately pressed upon us cannot safely be permitted to change the just construction of what we find in the instrument itself. So far as it goes, it is reasonably clear; and its application to any conditions which its terms do not in fact anticipate must be determined by the fundamental rules of law which we have already explained.

The case as put is one of the receipt by the telephone company of certain shares of capital stock, in addition to the annual rentals for which it has accounted to the Western Union; but it must not be obscured by the nature of the additional assets thus obtained. The case in this respect stands exactly the same as though the telephone com-

pany had received the equivalent of these shares in money, or had immediately converted them into money. For all present purposes, the transaction is to be scrutinized in the light of the fact that all questions as to the nature of the assets received are immaterial. The case stands, therefore, on the propositions of law and equity which we have already stated; that is to say, that the telephone company has received certain assets in addition to rentals by name, which it must account for under the first paragraph of article 1, unless the contract elsewhere clearly permits otherwise.

Not a word in the contract is brought to our attention which expresses such a permission. The respondent's case is built up on inferences, and it therefore rests upon it to show that these inferences so work into the body of the contract as to render it inconsistent with the application of the positive equities which we have said underlie instruments of this character. One proposition urged upon us is that in this long contract, carefully framed, between parties who were competent to provide for contingencies of the character we are considering, the constant use of the words "rentals" and "royalties," and the references to annual rates, must be accepted as a positive exclusion of any other benefit to come to the Western Union. But the mere fact of numerous repetitions, especially in long contracts, does not prove that they are not vain. On this topic we said in Reece Button-Hole Company v. Globe Company, 61 Fed. 958, 960, 961, 10 C. C. A. 194, as follows:

"The ordinary rule that if by a literal construction an instrument would be rendered frivolous and ineffectual, and its apparent object frustrated, a different exposition will be applied if it can be supported by anything in it, requires that words which relate to what may be held nonessentials, however much multiplied, shall not be permitted unnecessarily to control the sense."

Even if a literal interpretation, on the rules insisted on by the respondent, be given effect, it would easily be met by a deduction from what we have already said as to the meaning of the word "rentals" or "annual rentals." That which can be made certain is certain; and, whatever form remuneration takes, if it can be reduced mathematically to a rental, or annual rental, it is sufficient for even the most literal rules of construction. If, for example, in lieu of the "ten dollars per annum," named in paragraph 2 of article 1, the telephone company received, either in shares of stock or money, $100 for a 10 years' license, which seems to have been commonly granted, or $170 for a perpetual license, which would mean the entire 17 years for which the contract ran, either hypothesis readily computes an annual rental of $10, and, if received in advance, it must likewise be accounted for in advance.

But, from what we have already said, it follows that all this is a mere play on words. The course of business at the time the contract was made leads to the just conclusion that the parties thereto were not contemplating the taking of lump sums as a consideration for licensing telephones for the period of the contract or the larger portion thereof; but if the respondent did this, and thus departed from the specific mode of doing business then customary, it nevertheless remained justly chargeable under a true construction of the broad

provisions of paragraph 1 of article 1. The fundamental answer to this proposition of the respondent, therefore, is that it defeats itself, in that it goes so far that it strikes against the foundation of those rules of construction which, as we have already explained, are properly and necessarily applied to all contracts of the character before us, and according to which, as we have said, a description of particular forms of pecuniary returns must be regarded as merely illustrative.

The leading proposition of the respondent is based on one of the master's findings, which must be accepted as a finding of law, and has weight only accordingly. After stating, as we have already said, as a matter of fact, that nothing was paid for these shares of capital stock except an "exclusive perpetual license," he states at another point as follows:

"The defendant considered it was selling its exclusive right to carry on the business, and that in whatever way the value of this right was realized it is the exclusive owner of it; and I so find."

This proposition is made by the telephone company the burden of its case. This word "exclusive" is deduced from paragraph 1 of article 12 of the contract, and paragraph 1 of article 13, in each of which the word "exclusively" appears, as will be shown by the following transcripts thereof:

"The right to all uses of the telephone on wires of a district or exchange system is to remain exclusively with the party of the second part, excepting such temporary suspension of the application of this contract to certain localities as has been already herein provided for."

"The right to connect telephonic district or exchange systems for the purpose of personal conversation between persons at the instruments, and the right to use telephones on all lines not forming a part of a telephonic district or exchange system for such personal conversation (except so far as licenses for private lines are to be granted to the party of the first part under article 14), are to remain exclusively with the party of the second part, and those licensed by it for the purpose."

The respondent says that for success the licensees of the exchanges required not only telephones, but a monopoly; "they"—the licensees —"needed the exclusive right to do business in the district"; and it adds: "This monopoly which the licensees wanted to buy the defendant had for sale, and the defendant sold it to the licensees for a share of their capital stock." The respondent reiterates that the telephone company's contracts of leases, by virtue of which it received sundry shares of stock, conveyed much more than the right to use telephones, because each transaction was an outright sale of its monopoly of the exchange business for the locality concerned.

Thus, the respondent rests its case mainly on the word "exclusively," found in the extracts we have made from articles 12 and 13. But it is clear that for the purposes of this case this word has no legal force.

We must remark incidentally that in this proposition the respondent has worked out a most anomalous result. The forms of licenses in use by the telephone company establish the statement made by the master that it was usual to limit the use of certain telephones to exchange purposes. It is to be noted, however, that the telephone company also had forms of licenses limiting the use to private lines or

to other purposes expressly named therein. It is not necessary to elaborate the terms of these licenses. The anomalous result is that the telephone company claims to take something from the Western Union as the alleged logical sequence of its issuing limited licenses, thus making a part of greater value than the whole. Of course, it is not possible that there could be any such greater value.

Although the telephone company had certain exclusive rights under the contract, as between it and the Western Union any exclusive rights which it granted to its licensees were not the same, but they merely sprung out of them, because it was entirely at the option of the telephone company to grant licenses which contained no feature of exclusiveness. The fundamental and controlling proposition, however, is a simple one. The relations were so complicated that almost every provision of the contract in suit, if not every one, is subject to certain incidental exceptions; but, aside from that, the telephone company held under it a right to issue licenses exclusively for exchange uses independently of any terminology to that effect, precisely as it had a right to grant licenses exclusively for private lines, or for speaking tubes, or for any other special class of uses. So that, so far as this case is concerned, it may well be said, without any limitation, that the telephone company, from the mere force of the contract, as construed by the law, might grant exclusive rights with reference to every use to which the telephone could be put. It was in the power of the telephone company to contract with a corporation in Boston to grant it an exclusive license for that city, for a term of years, or perpetually, subject to a certain inevitable exceptions, for all speaking-tube purposes, or a like exclusive license for all private lines. With reference to each of the same, the telephone company acquired exclusively the same monopoly that it did as to telephone exchanges; but the respondent rests its case on this verbal distinction, and, inasmuch as the distinction is entirely immaterial in this connection, its case falls through.

It is easy to account for the use of the word "exclusively." Probably in no view of the case was it strictly necessary, and it seems to have been used ex majore cautela, balancing the same word as used in behalf of the Western Union. It was one great purpose of this contract to divide, by boundaries as clearly marked as practicable, the telephone field from the telegraphic field, giving the former to the telephone company and the latter to the Western Union. The contract is largely occupied with very careful details and precise conditions intended to accomplish this purpose in a practical way, and so far as possible to anticipate and prevent evasion. At many points it was impracticable to state anything more than general propositions, relying upon their being made practically effective by the general principles time and time again exhibited. Paragraph 1 of article 12, which we have quoted, is the formal beginning of the body of that part of the contract which seeks to effectuate this purpose. It is difficult even for the respondent to speak of articles 12 and 13, except in language describing them as pertaining to the portions of the contract which relate to the "dividing up of terri-

tory." Such was the fact. In the following out of this topic, article 15 directs the telephone company, in at least two places, to turn over to the Western Union "exclusively" messages for transmission by telegraph, so far as it can legally control the same; and many expressions in this division of the contract, including this word, are better adapted to impress the fact that each party was to respect the rights of the other within its peculiar territory, and to aid in securing each other with reference to the good will thereof, than to support the proposition that by any of them the telephone company possessed certain legal rights which it had without them. But whatever may have been the reason for inserting tne word "exclusively," it is clear, as we have already said, that it adds nothing to the case before us from the point of the law.

Other portions of the contract strengthen our general conclusion, and some of them lead to it quite positively. As we have already said, paragraph 7 of article 2 was not contained in the memorandum of September 27, 1879, except so far as it may be found in the general language thereof. That reads as follows:

"The party of the second part may increase the established annual rate, either generally or upon telephones used for any particular purpose, or by any particular class of licensees, from time to time, at its discretion, and such higher rates, while in force, shall be taken to be the gross rentals or royalties in respect of the telephones for which they are obtained."

This provides not only for increase of general rates, but specially for "increase upon telephones used for any particular purpose or for any particular class of licensees." This, of course, embraces telephones used for exchanges, and makes no exception arising out of the fact that they may be used under licenses exclusive for certain territories. It makes no distinction for or against licenses of an exclusive character, either for exchange, private lines, or speaking-tube purposes, whether perpetual or for a term of years. It gives no method, and suggests no occasion, for apportioning what may be received in the manner claimed by the respondent so as to make a specific allowance for monopoly or exclusive right. And it distinctly provides that "such higher rates while in force" shall be taken to be the gross rentals or royalties in respect to the telephones for which they are obtained. This language seems to be sweeping, clear, and emphatic, and to leave no room for any such apportionment as is now claimed before us.

The phraseology of paragraph 3 of article 2 is even more specific. That reads as follows:

"Telephones used on exchanges or lines owned in whole or part by the party of the second part, or by auxiliary corporations or organizations in which it is interested, or rented together with lines owned in whole or part by it, or by auxiliary corporations or organizations in which it is interested, shall be rated as paying to said second party the said recognized standard rates, or such other rates as may hereafter be established in accordance with this contract for like uses by parties other than the second party or auxiliary corporations or organizations in which it is interested, less the commissions and allowances provided for by this contract; but whenever the party of the second part is or shall be interested with others in the ownership of such exchanges or lines, the annual rental or royalty actually charged to and re-

ceived from the owners thereof for the use of the telephones, if greater than the rates established as aforesaid, shall be taken to be the gross rental for the purpose of ascertaining the stipulated bonus or royalty."

As we have already said, that portion of this paragraph which begins with the words, "but whenever the party of the second part," was new in the contract as executed, and appeared neither in the "Outline" nor in the memorandum of September 27, 1879. We have already shown that, on a true construction of contracts of this character, the words "rental or royalty," found herein, must stand for and represent any gross sum received for a perpetual license or other interest; and such being the fact, this portion of this paragraph specifically prohibits the telephone company from receiving for telephone licenses any special advantage to itself, whether by shares of stock or money, without apportioning it to the Western Union. It must be admitted that apparently the first portion of the paragraph makes a certain concession in behalf of exchanges or lines actually owned in whole or part by the telephone company. This consideration was undoubtedly yielded to the necessities of the case, arising out of the fact that, where the telephone company had an interest, especially the whole title, the accounts might not, or could not always be kept, so as to show specifically what was a just allowance merely for licenses. This portion of the paragraph, however, is limited to the operation of exchanges after the telephone company becomes interested in them, and it has nothing to do with the acquirement of such interests. Moreover, it is especially guarded, so far as practicable, in order to secure to the Western Union its share of what would be reasonable and just rates proportionate to those paid by other exchanges in which the telephonic company had no interest.

The answer alleges that the practice of the telephone company with reference to the matters covered by this bill was well known to the Western Union, and that until shortly before the commencement of this suit it made no complaint thereof, but, on the contrary, "recognized such course of dealings." This is not in such definite language as to make it clear whether the respondent intended to raise a question of laches or to make the proposition that the Western Union had practically construed the contract as claimed by it. The bill, as we have said, was filed on November 16, 1883, four years from the execution of the contract. The demand by the Western Union on the telephone company for this accounting was contained in a letter of February 26, 1883. Of course, on well-settled principles, the acquiescence of both parties for over three years in the construction of a contract, involving so many elements as this, would be of great importance when a court comes to determine its meaning. Laches is, of course, available when plainly raised by the proofs, even if not set up in the answer. The master finds no facts of a definite character with reference to either of these topics. The respondent, moreover, referred to this line or lines of defenses, whichever it is, in only a brief, indeterminate, and incidental manner. On being specifically inquired of by the court on this topic, nothing more satisfactory in reference thereto was obtained. The

answer does not allege how long the Western Union had known of the course of business which this case develops, and nothing in the findings of the master, or in the proofs brought to our attention, contains anything in that respect. Therefore we are not required to give attention to this phase of the defense.

It is claimed by the respondent that on this bill no relief can be granted according to the case made by the proofs and submitted to the court by the complainants. This point seems to be that to reach the case the bill should have prayed that the contract be reformed, or should have alleged artifice on the part of the telephone company in fraud of complainants. But, in view of the construction and effect which we give the contract, the prayer of the bill, so far as it asks an accounting for the amount and value of assets received for licenses to use telephones, is appropriate to the facts. The prayer, however, asks for an accounting for telephonic appliances, which, of course, is erroneous. It also asks specifically that the shares of stock received by the telephone company, and other incidental matters described in the prayer, be transferred to the Western Union, and that the dividends thereon be also accounted for, with interest on each item. None of these details are within the scope of our present adjudication. The disposition of them will turn on a further investigation to be made by the Circuit Court.

We find nothing in the case which raises any practical issue except the specific matter which we have discussed, and that we find to be limited to certain shares of stock alleged to have been received by the telephone company. We therefore determine that the only issue is the ascertainment as to certain shares of stock received by the telephone company since November 1, 1879, in consideration, in whole or in part, for licenses to use telephones, and as to the incidentals appurtenant thereto.

We exclude from the accounting anything received by the telephone company in any form which was properly the equivalent of what it possessed the day as of which the contract went into effect; that is, November 1, 1879. As, for example, so far as at that time the telephone company had given any license, if there were any such, involved in any contract entitling it at the end of a specific period to receive a surrender of the whole or any part of the plant or other incidents of a telephonic exchange, and so far as subsequent to November 1, 1879, the telephone company surrendered such option and gave a new license, receiving an obligation for the usual rentals or royalties, and certain shares of corporate stock, such portion of such corporate stock as represented the value of the option surrendered pertains to the telephone company, and is not to be accounted for. It may, and probably will, be difficult to make this apportionment; nevertheless, if there are any conditions existing, as we have stated, the apportionment must be made as can be best done. In this connection we repeat that we do not intend hereby to conclude or preclude any questions with reference to dividends or interest, and all such questions are reserved, so far as we are concerned, until the case comes to us again from the Circuit Court, if it ever does.

Of course, the accounting, according to settled practice in equity, will be brought down to as late a period as is practical; and, all parties having already had full opportunity of bringing into the record all facts essential to the final accounting, each must, on such accounting, be confined to the present record, except so far as equity shall require otherwise.

In view of the state of the record thus spoken of, it is probable that we could proceed further, and dispose considerably of the issues involved in the accounting; but the proper practice is that pointed out in Chicago, Milwaukee & St. Paul Railway v. Tompkins, 176 U. S. 167, 179, 20 Sup. Ct. 336, 44 L. Ed. 417. In the form in which this case comes to us—that is, on a general finding against the complainants—it might be impracticable for us to go further into details without doing injustice. However, we are entitled to avail ourselves of the relief which comes from the rule stated in the case just cited.

We have thoroughly considered the very careful reasoning of the Circuit Court in this case, and differ from it only after much deliberation. We have reached our conclusion by holding firmly to the true issue in the case, from which there has been a grave departure, originating with those portions of the master's report which we have cited, and further induced by some of the complainants' exceptions thereto, and by propositions urged by the respondent before us and in the Circuit Court.

The decree of the Circuit Court is reversed, the case is remanded to that court to enter a decree for the complainants for an accounting, and for further proceedings in accordance with our opinion, and the appellants recover their costs of appeal.