ENGLISH et al. v. BROWN et al.

(District Court, D. New Jersey. November 30, 1914.)

1. JUDGMENT ⬿715—CONCLUSIVENESS OF ADJUDICATION—PROBATE PROCEEDINGS.

The decree of a probate court, adjudging an estate insolvent after an examination of the administratrix, who was also the widow of the decedent, made on petition for a discovery by a judgment creditor, and also approving her final account, *held* not a bar to a subsequent suit by the

creditor against the widow to set aside alleged fraudulent conveyances of property to her by her late husband.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1244–1246; Dec. Dig. ☞715.]

2. FRAUDULENT CONVEYANCES ☞74—CONSIDERATION—"VOLUNTARY CONVEYANCE."

To render a conveyance "voluntary" and void as to creditors, there must have been a total want of any substantial consideration. A mere inadequacy of consideration does not bring it within the definition of a voluntary conveyance, nor in such case can it be avoided, unless made with a fraudulent intent.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 186–190; Dec. Dig. ☞74.]

For other definitions, see Words and Phrases, First and Second Series, Voluntary Conveyance.]

3. HUSBAND AND WIFE ☞47—CONVEYANCE OF PROPERTY BY HUSBAND TO WIFE—VALIDITY—CONSIDERATION.

Under the law of New Jersey, while a direct transfer of property by a husband to his wife in repayment of advances made to him by her out of her separate estate is not good at law, it is enforceable in equity as against the claim of a subsequent judgment creditor.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 232–241; Dec. Dig. ☞47.]

4. FRAUDULENT CONVEYANCES ☞300—TRANSACTIONS BETWEEN HUSBAND AND WIFE—EVIDENCE OF FRAUD—FAILURE TO KEEP ACCOUNTS.

The fact that a husband and wife kept no strict account of transactions between themselves respecting money of the wife advanced to or collected by the husband and used in his business is not an evidence of fraud, to invalidate a transfer of property to the wife in repayment.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 896–903; Dec. Dig. ☞300.]

5. FRAUDULENT CONVEYANCES ☞299—TRANSFERS OF PROPERTY BY HUSBAND TO WIFE—VALIDITY.

Transfers of corporate stock by a husband to his wife *held*, on the evidence, to have been made in good faith in repayment for money from her separate estate advanced by the wife and used by her husband, and valid as against a creditor of the husband, where the latter was at the time solvent and retained a substantial amount of the same stock in his own name; but a subsequent transfer of all his remaining stock to his wife, after he was in failing circumstances and a large judgment had been obtained against him, although based on an adequate consideration, *held* fraudulent and voidable as against the judgment creditor.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 876–890; Dec. Dig. ☞299.]

6. FRAUDULENT CONVEYANCES ☞155—TRANSFERS OF PROPERTY BY HUSBAND TO WIFE—VALIDITY.

While a husband, although in failing circumstances, may transfer property to his wife for an adequate consideration, in order to be valid, the transfer must also have been executed and received in good faith and for an honest purpose; and if the wife had or was chargeable with knowledge of an intent on the part of the husband to hinder, delay, or defraud creditors, and the transfer had that effect, it will be set aside as fraudulent in equity at their instance.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 493; Dec. Dig. ☞155.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Creditors' suit by Paul A. English, Arthur English, and Otto B. English against Ella Wyman Brown and the United States Gypsum Company. Decree for complainants.

Andrew Foulds, Jr., of Passaic, N. J., and H. C. Brome, of Omaha, Neb., for plaintiffs.

Jesse Watson, H. Francis Dyruff, and Selden Bacon, all of New York City, for defendants.

HUNT, Circuit Judge. The plaintiffs, Paul A. English, Arthur English, and Otto B. English, who for convenience will be called the English brothers, brought this suit in December, 1912, as judgment creditors of Charles B. Brown, deceased, against Ella Wyman Brown and the United States Gypsum Company. Thereafter Ella Wyman Brown, as administratrix with the will annexed of Charles B. Brown, deceased, was added as a defendant. The purpose of the suit is to set aside transfers of certain stock in the United States Gypsum Company, made by the decedent, Charles B. Brown, to his wife, Ella Wyman Brown, defendant herein.

Plaintiffs set up two claims—one under a judgment for $21,534.27, against the administratrix, entered in New Jersey on May 6, 1912, based on a judgment for $16,298.74 rendered in the courts of New York against the decedent, Brown, on January 13, 1906, in an action begun in New York in June, 1905, and which action in turn was based upon a breach of contract made in January, 1902, between the testator and the English brothers; the second under a judgment for $5,412.91, entered against the administratrix in New Jersey on July 5, 1912. This last-mentioned action was in tort, arising out of an alleged malicious issue of attachment by Charles B. Brown against the plaintiffs herein in a counter action in contract instituted by Brown in New York in 1906.

It appears that about July, 1901, Charles B. Brown, the husband of the defendant, Ella Wyman Brown, aided in promoting the organization of the United States Gypsum Company. The plaintiffs then owned certain properties in Kansas, Michigan, and New York which Brown wished to include in the new corporation, and an agreement was entered into between Brown and the plaintiffs, whereby Brown agreed to give to the plaintiffs out of the promotion stock $31,250 of the preferred and $18,750 of the common stock. In due time, the United States Gypsum Company was incorporated under the laws of the state of New Jersey in 1902, and plaintiffs conveyed to the corporation. Stock was issued to Brown, but because of a refusal on the part of Brown to deliver a certain number of shares of stock to the plaintiffs, as it was contended he was obliged to do under the agreement, action was instituted by the plaintiffs against Brown in the Supreme Court of New York on June 13, 1905. This is the action just heretofore referred to as being the one which resulted in a judgment in favor of the plaintiffs against Brown for the stock in the corporation or its value, $16,298.74. After judgment was entered upon the case in New York, Brown brought the counter suit referred to against the plaintiffs on a contract for $52,000.

In the case just mentioned an attachment was issued at Brown's instance, and the judgment already referred to, which the English brothers had theretofore obtained against Brown, was levied upon. Brown prevailed in the trial court, but the appellate court set aside the judgment and ordered a new trial. Brown v. English, 131 App. Div. 909, 115 N. Y. Supp. 1113; Brown v. English, 137 App. Div. 900, 122 N. Y. Supp. 1123. In April, 1910, an order was served on the attorneys for Brown in the attachment suit, requiring Brown to give additional security on the attachment by May 30, 1910, under penalty of the dismissal of his action. Brown failed to give the security, and the action was dismissed on June 27, 1910, and judgment entered in favor of the plaintiffs herein, defendants therein. Thereafter the English brothers brought action in New Jersey for malicious prosecution, based upon the issuance of the attachment in the action just referred to, and also sued upon the New York judgment on contract as stated. Brown appeared in these two actions, that against him for malicious prosecution, and that against him for recovery under the original judgment which had been theretofore obtained in New York in 1906, but died during their pendency.

His will left all of his property to his widow, Ella Wyman Brown, defendant in this suit. Thereafter, on February 6, 1911, letters of administration with the will annexed were issued to Ella Wyman Brown, and in due course the administratrix was substituted as defendant in place of Charles B. Brown. In due course the actions heretofore referred to proceeded against her, so that judgment was rendered against her by default; the judgment in the contract action being rendered on May 6, 1912, for $21,534.27, and that in the tort action being rendered on July 5, 1912, for $5,412.91. Executions upon these judgments were returned unsatisfied on November 12, 1912, and thereafter the present suit was brought.

The complaint in the present suit, after the allegations concerning the judgments, alleges that Brown fraudulently and without consideration, and with intent to defraud his creditors and these plaintiffs, and to embarrass them in enforcing their claims against him, and to conceal his property, transferred his stock in the Gypsum Company to Ella Wyman Brown, defendant, and that she now holds and claims such stock; that at the time of the transfer she knew of the existence of the debt of her husband to the plaintiffs, and of his purpose of avoiding using the stock to pay the indebtedness; that she paid no consideration for the transfer, but accepted the stock to prevent the application of the proceeds thereof to the payment of the judgments; that the par value of the preferred stock issued to Brown was $33,000 and of the common stock $33,000; that Brown under the agreement was entitled to receive an additional amount of preferred and common stock of the corporation; that a large quantity was issued by the Gypsum Company to one H. J. McCormick, as trustee for Brown, and was held by McCormick as such trustee at the time of the death of McCormick, which occurred October 17, 1911; that thereafter Ella Wyman Brown, defendant, obtained the stock from the representatives of McCormick, and that her purpose

was to prevent the application of the stock or dividends toward the payment of the indebtedness existing in favor of the plaintiffs against Brown; that the defendant Ella Wyman Brown asserts that the estate of her husband is insolvent, and that the stock belongs to her; but plaintiffs allege that in equity the stock, property, and assets are subject to the lien of their judgments and executions thereunder.

Defendant Ella Wyman Brown by answer admits that shortly after the Gypsum Company was organized her husband received from the corporation 330 shares of preferred stock and 330 shares of common stock, but she denies any knowledge of any agreement to transfer stock to the plaintiffs. She admits the proceedings had in the New York courts, and alleges that about February 20, 1903, her husband sold and transferred to her for valuable consideration 200 shares of preferred stock and 100 shares of the common stock of the Gypsum Company. She denies fraud in connection with the transfer to her of any shares of stock by her husband, and says that about August 3, 1909, her husband transferred to her the balance of the stock which had been originally issued to him, consisting of 130 shares of preferred and 230 shares of common stock of the corporation, and that such transfer was for a consideration of full value; that she paid partly in cash by advances at various times, and that part payment was made in moneys which he had collected for her, but never paid over or accounted for. She further sets forth that her husband, under an agreement between himself and H. J. McCormick, was entitled to receive an additional amount of stock, and that on May 15, 1905, for a good and valuable consideration, the right to this stock was transferred to her, and that thereafter, on February 6, 1912, in an accounting with the estate of McCormick, she received the stock, for which she says she 'paid full consideration to her husband in the form of advancements and moneys for which he had not accounted; but she says that when the right to this stock was sold to her by her husband on May 15, 1905, it was worth $6,088, although when turned over to her on February 6, 1912, it was worth $12,099. She then sets up that her husband's estate was insolvent, and had been so decreed by the orphans' court of Morris county, N. J.; that she had a right to do anything she pleased with the stock, as it was her own property.

With considerable detail, she alleges that she had property of her own in 1878, when she married Brown, and frequently made advances to him, and that the transfer of the shares to her was in consideration of such advances and loans made by her covering the years from her marriage in 1878 up to 1909. She pleads that about October 3, 1912, as administratrix, she filed in the orphans' court in New Jersey an inventory or final accounting, and that the English brothers obtained an order for examination and discovery of the defendant as administratrix, and that hearing was had on the 17th of October, 1912; that the hearing was closed by stipulation, and that thereafter by order of the orphans' court the estate of Charles B. Brown was duly declared insolvent; that because of the proceedings had in the orphans' court, and because of the decree that the estate was in-

solvent, a bar exists against relief being accorded to the plaintiffs in this action. Laches are also relied upon by the defendant, because plaintiffs herein knew of the various transfers of stock, beginning with that of February 20, 1903, yet until the bringing of the present suit they never notified defendant of any claim in regard to the same, and because of laches on the part of these plaintiffs she has lost valuable evidence and papers. Defendant also sets up that any cause of action which the plaintiffs have did not accrue within six years before the filing of the complaint.

Trial was had and evidence submitted.

[1] Defendants urge that the claims of the plaintiffs have already been adjudicated against them. The ground taken by the defendants is that the orphans' court in New Jersey entered a decree declaring that the estate of Charles B. Brown, deceased, was insolvent. The proceedings had in the orphans' court were such as are usually connected with the administration of an estate. Mrs. Brown was appointed as administratrix, notice to creditors was published; and notice of the settlement of the account was given. On October 9, 1912, the English brothers filed a petition in the orphans' court, setting up that Charles B. Brown, at the time of his death, owned 330 shares of preferred and 330 shares of common stock in the Gypsum Company; that the certificates for that stock had come into the hands of the administratrix, and that she had converted the shares to her own use; and that she had other shares indorsed to her as administratrix, which she had misapplied. The petition prayed for a discovery, and order granting discovery was made.

Thereafter, in due course, examination of Mrs. Brown was had, but by consent of counsel the proceedings were discontinued, and on January 3, 1913, formal order of discontinuance was made. Prior to that date, Mrs. Brown had presented her final account as administratrix, in which she did not charge herself, as administratrix, with any of the Gypsum stock involved in this litigation or its proceeds as assets, and she asked that the estate be decreed insolvent, and, as has already been said, decree declaring the estate to be insolvent was entered.

I cannot believe that the decision of the orphans' court, approving the account of the administratrix and adjudging the estate to be insolvent, constitute a bar to the trial of the issues presented in this suit. The examination had at the instance of the English brothers in the orphans' court was a proceeding in discovery only, not a final determination that Mrs. Brown did not hold property belonging to the estate for which she was accountable; nor should it be held that the orphans' court attempted to determine that the transfer by the deceased of the shares of stock in controversy operated to the prejudice of the creditors of the deceased.

It will simplify to examine each of the three transactions involved separately. First, there is the matter of the 200 shares of preferred and 100 of the common stock which were transferred by the husband to his wife on February 20, 1903; second, on May 15, 1905, the transfer of the interest of the decedent in certain other shares,

which we can call the McCormick shares, consisting of 152 shares of common and 137 shares of preferred; and, third, the transfer of August 3, 1909, when the decedent transferred to his wife 130 shares of preferred and 230 shares of common stock.

Let it be understood, too, that examination into each of the transactions here involved has been made under an earnest belief that, where transfers of property by a husband to his wife are assailed by his creditors, great care must be exercised by the courts in their investigations. In the confidential relationship of marriage, the opportunity to remove property from the reach of creditors by transfer from the husband to the wife is so easily availed of, and when used circumstances of wrong intent so hard to be ascertained, that it is in the interest of justice to those who have honestly dealt with the husband that unusual effort be made to reach the truth and to avoid being misled by arguments which may have fallacious or specious foundations.

Now, as to the first transfer: While the evidence is not as satisfactory as it might be concerning the character of the transfer of 1903, whether it was a security given by Mr. Brown to his wife, or was an out and out transfer as a payment, the weight of evidence points to its having been an unreserved transfer or sale.

There is no allegation by the plaintiffs that Brown was insolvent at the time of the transfer to his wife in 1903, nor is there any substantial evidence tending to show that at the time of such transfer Brown did not have assets out of which payment on a money judgment could have been compelled. It is admitted, too, that the plaintiffs knew of this transfer as early as 1904 or 1905, and that they had free access to the corporate books in 1903, when the transfer was actually made. Furthermore, subsequently, when plaintiffs instituted suit upon the contract in the courts of New York, they relied upon a right to recover the stock or a money judgment for its value. The judgment in New York and notice of entry thereof were served upon Brown on February 3, 1906. In this judgment there was a provision that Brown might at his option, within 30 days after entry of judgment and notice thereof, deliver $31,250 of Gypsum preferred and $18,750 of Gypsum common stock, and pay the costs, and that in such case the judgment should be satisfied, but otherwise should stand as a money judgment for the $16,298.74 claimed as value in the pleadings. As Brown did not deliver the stock within 30 days, the judgment became an absolute money judgment on March 5, 1906.

It is not to be disputed that at the time of the marriage of Mr. and Mrs. Brown, in 1878, she had about $25,000 of her own, and had an annuity of over $400. In 1897, she owned in her own name property in Omaha of the approximate value of $50,000. Mrs. Brown testified, on the petition for discovery heard in the orphans' court in 1912, that she had loaned Mr. Brown money at different times, and that the stock was made over to her for value received; that she did not keep full memoranda of transactions between herself and her husband; but that he turned over part of the stock to her at the time

of the organization of the Gypsum Company to pay her. In her examination, this occurred:

"Q. Do you mean that a part of the stock that was originally issued to him (Brown) at the time of the organization was issued to you? A. I do. Q. Well, what part? A. I cannot tell you to-day. Q. Or how much? A. I should say half of it; I cannot tell positive. With your husband you do not keep so strict a reckoning as you do with a lawyer. Q. Did you keep any record of that transaction? A. Yes; there was a record of it. Q. What kind of a record was made of it? A. I don't know as I can tell; just a memoranda. * * * Q. In what form do you remember it was transferred to you? A. The stock was made out to me, as I remember it, at the time he received it. Q. It was put in your name? A. It should have been."

Again, while testifying concerning loans to her husband, she was asked if she kept any account with him:

"Q. Yes; any record? A. Yes; as much as it is necessary to have with a good husband. Q. How much of a record have you? A. I cannot tell. Q. Were any books or memoranda made? A. No; I never kept any books with what I loaned my husband. I merely demanded that he should give me something for it, as he invested in things I did not believe in. Q. When you loaned him money, did you lend it by way of checks? A. Many times. Q. Did you lend him any considerable sums in any other way, except by checks? A. Sometimes he acted as my agent, and took my money, and it never went through my hand at all. He took it and used it. I have a little property, and, of course, he was perfectly honest, and I trusted him. Q. Have you got the checks for the money that you yourself loaned him? A. I have got a number of checks; yes. * * * Q. Now, you say that a part of this Gypsum stock was issued in your name by the company. A. I do, as I recollect it; that I have had a part of it. I furnished the $10,000 that was put up to promote that business. Q. Now, did you have any written agreement with your husband with regards to the putting up of this money or issuance of this stock? A. I had an understanding that I was to be fully paid and more than paid back."

She further said that her husband delivered the stock to her at their home in New Jersey; that she had received the dividends from the stock; that she had paid out large sums of money for Mr. Brown's benefit during the Gypsum promotion scheme; that her husband had frequently obtained money from her, not only from rentals from the property she owned in Omaha, but from collections upon mortgages which belonged to her; that she had trusted him with everything; that he had used her funds without saying anything to her, but that he always told her he would make good whatever sums he used.

From time to time throughout their married lives, there were repayments by Mr. Brown to her of sums clearly due to her from him, and in 1903, when the transfer of stock was made, his debt to her was not less than the then value of the stock transferred. The purpose of the 1903 transfer was to repay for all advances made by his wife to him up to that time. A circumstance strongly confirmatory of this fair inference from the evidence is that, when the 1903 transfer was made, Brown did not make over all of the stock he then had, but kept 130 shares of preferred and 230 shares of common stock, besides having an interest in the McCormick shares, which made enough to cover any claim that the English brothers could then have asserted against him. It may have been knowledge of the fact that Brown was financially able to meet any claims which they might have against

him which prevented any action by the English brothers at that time; but, whatever may have led to their inaction, it is fair to say that in 1903 failure on Brown's part to transfer a greater number of shares than he did make over to his wife overcomes the argument that at that time he had in mind a scheme to defraud plaintiffs in this suit, or to hinder them in the collection of their claims.

[2] Surely, under such a state of facts, the contention that the transfer from the husband to his wife was voluntary is not sound. A voluntary conveyance is one where there is a total want of any substantial consideration; mere inadequacy of consideration is not enough to bring a conveyance within the definition of voluntary conveyances. If there is a total want of any substantial consideration, creditors of the grantor may avoid such a conveyance; but if the consideration is substantial, yet inadequate merely, the conveyance will not be void as to creditors unless it has been made with a fraudulent intent. 3 Washburn on Real Property, 2272.

[3] We may assume that a contract directly between a husband and wife would not be held valid at law in New Jersey; but it seems very clear that equity will recognize a transfer made directly from the husband to his wife, when founded on a valuable consideration. That a husband may make a contract with his wife which will be upheld in equity was ruled in Executor of Farmer, Deceased, v. Farmer et al., 39 N. J. Eq. 211, cited by the plaintiffs.

Woodruff v. Clark et al., 42 N. J. Law, 198, decided in 1880, was an action at law, where plaintiff claimed property by virtue of a chattel mortgage executed to her by her husband to secure an alleged loan, but where the chattel mortgaged property remained in the possession of the husband and was seized by subsequent execution against him in favor of the defendants. Chief Justice Beasley prefaced his discussion of the case by stating that the plaintiff was obliged to prove the chattel mortgage given to her by her husband, and that, as she had never had the chattels in her possession, she had no standing on the legal merits of the case, unless she could establish the validity in law of the conditional sale. But he added:

"That this transfer was enforceable in equity, and that the title of the plaintiff would have been protected in that forum against the claims of her husband's creditors, no one will deny; the only question being whether such transfer can be recognized and effectuated by a court of law."

In Garwood v. Garwood, 56 N. J. Eq. 265, 38 Atl. 954, decided in 1897, it was held that a husband can enter into an enforceable contract to repay his wife money loaned to him by her, and that such a contract is good in equity as against the claim of a subsequent judgment creditor of the husband, who has levied his execution, contesting the validity of the mortgage solely upon the ground that it was made directly by the husband to his wife without the intervention of a trustee.

Turner v. Davenport, 63 N. J. Eq. 288, 49 Atl. 463, decided in 1901, cited by the plaintiffs to sustain the proposition that a legal contract cannot be made between husband and wife in the state of New Jersey, may support the well-settled common-law rule that the wages and

earnings of the wife became or could become by reduction to possession the absolute property of the husband; but the case is positive authority to sustain the general rule that, under the married women's acts of the state of New Jersey, the rule of the common law has been superseded by statute, and that a wife may maintain a suit in equity even against her husband to enforce a contract for the performance of service to a copartnership of which her husband was a member.

Such, too, is the general rule recognized by the Supreme Court of the United States, in Wallingsford v. Allen, 10 Pet. 583, 9 L. Ed. 542. It was there said:

"Agreements between husband and wife, during coverture, for the transfer from him of property directly to the latter, are undoubtedly void at law. Equity examines with great caution before it will confirm them. But it does sustain them when a clear and satisfactory case is made out that the property is to be applied to the separate use of the wife; where the consideration of the transfer is a separate interest of the wife, yielded up by her for the husband's benefit, or of their family, or which has been appropriated by him to his uses; where the husband is in a situation to make a gift of property to the wife, and distinctly separates it from the mass of his property for her use. Either case equity will sustain, though no trustee has been interposed to hold for the wife's use. In More v. Freeman, Bunb. 205, it was determined that articles of agreement between husband and wife are binding in equity, without the intervention of a trustee. Other cases may be cited to the same purpose. In regard to grants from the husband to the wife, an examination of the cases in the books will show, when they have not been sustained in equity, it has been on account of some feature in them impeaching their fairness and certainty, as that they were not in the nature of a provision for the wife, or when they interfered with the rights of a creditor, or when the property given or granted had not been distinctly separated from the mass of the husband's property. In Slanning v. Style, 3 P. Wms. 334, Lord Talbot assumed the doctrine that femes covert could have a separate interest by their husband's agreement. In the case of Lady Arundel v. Phipps, 10 Ves. 146, 149, Lord Eldon held that a husband and wife after marriage could contract, for a bona fide and valuable consideration, for a transfer of property from him to her. In Shepard v. Shepard, 7 Johns. Ch. (N. Y.) 57 [11 Am. Dec. 396], it is said husband and wife may contract, for a bona fide and valuable consideration, for a transfer of property from him to her. In Walter v. Hodge, 2 Swanst. 97, it is said husband may convey to the wife a chattel. In the case of gift from the husband to the wife, it is held valid, when the husband, by some distinct act, divests himself of his property. As, for instance, in the case of Lucas v. Lucas, 1 Atk. 270, the Lord Chancellor held that the transfer of £1,000 South Sea annuities by the husband, in the name of the wife, was so decisive an act as amounted to an agreement by the husband that the property should become hers. It is not necessary to review here the cases of gifts to the wife by the husband, which have been sustained in equity. They are alluded to, to show how far equity has gone in maintaining transfers of property by the husband to the wife, without the intervention of a trustee, and when there was no valuable consideration money from the wife to the husband."

Metzker v. Bonebrake, 108 U. S. 66, 2 Sup. Ct. 351, 27 L. Ed. 654, has a bearing upon the present case. There suit in equity was brought by an assignee in bankruptcy to set aside a conveyance of real estate made shortly before the bankruptcy by the bankrupt to his wife through the intervention of a third party. The evidence showed that the husband, throughout a period of years after marriage, had come into the possession of moneys belonging to the wife, and that the husband was

insolvent when he made the conveyance of certain lands to his wife, but that the wife did not know of his insolvency. It was shown that the land was conveyed in good faith and without purpose to defraud creditors. The Supreme Court sustained the transfer, and approved of the decision of Atlantic National Bank v. Tavener, 130 Mass. 407, wherein the Supreme Court of Massachusetts held that a loan by a wife to her husband of money which was her separate property, upon his promise to repay it, created an equity in her favor which a court of equity would enforce; it not appearing that repayment of the loan was made with the purpose of hindering, delaying, or defrauding creditors. Such a conveyance was regarded not as a voluntary one, and was sustained against the creditors of the husband. Magniac v. Thompson, 7 Pet. 348, 8 L. Ed. 709; Garner v. Second National Bank of Providence, 151 U. S. 420, 14 Sup. Ct. 390, 38 L. Ed. 218.

Another case of importance is Bean v. Patterson, 122 U. S. 496, 7 Sup. Ct. 1298, 30 L. Ed. 1126. There William Miller deeded land to a trustee for the benefit of his wife at a time when he was insolvent. When an attack was made upon the transaction, and a court of equity was asked to set aside the deed as fraudulent and void, the Supreme Court said:

"If, therefore, there had been no other consideration for the deed than a desire to secure for his wife provision against the necessities of the future, it could not be sustained. It must find its support in the fact, alleged in the recital, that the amount secured was a sum realized from the sale of her individual property, and used by him. It is not material whether the recital be accurate in stating that the sum received from the sale of her property was used in payment of the real estate covered by the deed; it is sufficient if Miller was indebted to his wife in the amount mentioned. That the property in Pennsylvania, deeds of which are mentioned above, was used for his benefit, and to pay or secure his debts, is sufficiently established. The amount realized therefrom, as we read the evidence, was greater than the sum named in the trust deed as due to her. That deed for her security stands, therefore, upon full consideration. Had it been given to a third party for a like debt, it would not be open to question that it would have been unassailable. The result is not changed because the wife is the person to whom the debt is due and not another. While transactions by way of purchase or security between husband and wife should be carefully scrutinized, when they are shown to have been upon full consideration from one to the other, or, when voluntary, that the husband was at the time free from debt and possessed of ample means, the same protection should be afforded to them as to like transactions between third parties."

Seitz v. Mitchell, 94 U. S. 580, 24 L. Ed. 179, decided in 1876, relied upon by plaintiffs, involved the construction of a statute (section 727, R. S. District of Columbia) which made the right of a married woman to property belonging to her at the time of marriage, or acquired during marriage in any other way than by gift or conveyance from her husband, as absolute as if she were unmarried. The court held that under the statute the earnings of the wife during coverture could not be part of her separate estate, but belonged to her husband, and that she could have such earnings only by the gift of her husband, and such gift was not protected against his creditors. But the court laid emphasis upon the failure of Mrs. Seitz to aver that she had paid for the lots involved out of her separate property, or to aver or prove that she had any separate property, and had paid for the lots with her own sep-

arate property. The whole case turned for decision upon the point that under the statute referred to the earnings of the wife did not belong to her, because they were not part of a separate estate, and the possession of money by the wife raised no presumption that it was her separate estate. In certain language, however, the opinion of Justice Strong implies that purchases of either real or personal property made by the wife of an insolvent debtor during coverture, while justly to be regarded with suspicion, are yet to be upheld where it clearly appears that the consideration has been paid out of her separate estate.

Schreyer v. Scott, 134 U. S. 405, 10 Sup. Ct. 579, 33 L. Ed. 955, decided in 1890, is much closer to the instant case than is Seitz v. Mitchell, and it is worthy of passing notice that Seitz v. Mitchell is not cited in Schreyer v. Scott, but the earlier cases of Smith et al. v. Vodges, 92 U. S. 183, 23 L. Ed. 481, decided in 1875, one year before Seitz v. Mitchell, and Sexton v. Wheaton, 8 Wheat. 229, 5 L. Ed. 603, decided in 1823, are.

The question presented in Schreyer v. Scott was whether certain transfers of property made by Schreyer to his wife were fraudulent and void as against a creditor of the husband. Upon the facts, the Supreme Court found that according to the testimony of Schreyer the deeds were not made as a voluntary transfer, but rather to pass the legal title to his wife of property of which she was prior thereto the equitable owner, but in which she had at least an equitable interest. Mrs. Schreyer in that case, like Mrs. Brown in this, had considerable money at the time of her marriage. She had purchased property with her own money, and rentals from property so purchased were treated as hers. The balance of money which she had when she married was passed over to her husband from time to time for improvements on the property and to use in his business. Without entering into detail, the Supreme Court rested its decision upon a finding that the testimony clearly disclosed that Mrs. Schreyer at the time of her marriage was possessed of separate property which was the foundation and largely the source of subsequent accumulation, so that the conveyances by Schreyer to his wife were not purely voluntary, but meritorious and upon good consideration.

[4] The facts in the Schreyer Case are also like those in the present, in that there was considerable objection to the testimony of Schreyer, because what he said was confused and uncertain, without definiteness as to amounts and dates, and because moneys received for rent after the conveyances were deposited by Schreyer in his own name and were managed and handled by him as his own, and no accounts were kept between husband and wife of their separate moneys, but all were mingled in one fund in his hands. Meeting this argument, which is really the substance of the argument of counsel for the English brothers with respect to the transactions under investigation, the Supreme Court said:

"But does all this indicate fraud? If his testimony is worthless and to be rejected, then there is practically no testimony interpreting those transactions, and the court never presumes fraud. The very confusion and carelessness in the dealings between husband and wife make against rather than in favor of the claim of fraud. There is no evidence that he was in debt at the time of these conveyances, at least beyond a trifling amount, which was subsequently paid; and if the parties had intended fraud and wrong,

unquestionably their accounts would have been kept carefully and accurately, and books would now be presented showing such accounts. Husband and wife evidently saw no necessity of dealing with each other at arm's length; the title to the property was placed in her name, when there was no legal or equitable reason why it should not be done; and the rents and other cash receipts were not unnaturally kept in one account and handled as one fund. The lack of substantial indebtedness and the record of the transfer being established, the carelessnesss of their dealings tends to prove honesty, rather than to establish fraud."

[5] We may therefore dispose of the first transaction, or the 1903 transfer, by saying that in the light of the decisions of the New Jersey courts, which are not out of harmony with the decisions of the Supreme Court of the United States, the transfer to Mrs. Brown by her husband was valid, and was made for ample consideration by way of advances made to him by her from her separate estate, and with the intent on his part to repay her, and without intent or purpose on his or her part to hinder or delay these plaintiffs or any one else in the collection of any claims that they might have against him at the time of the transfer. The stock, therefore, was lawfully made over to Mrs. Brown, and plaintiffs have failed to establish any right or claim to it, or to any proceeds which ever passed into the hands of Mrs. Brown by reason of any sales of it, or any part of it.

II. We now pass to the 1905 transaction. This, too, under the evidence, must be regarded as a bona fide transfer or sale, and not as a pledge. This transfer arose out of the agreement made on August 31, 1901, between H. J. McCormick, P. S. Jones, and the deceased, Charles B. Brown. Jones and McCormick were to aid in the promotion and consolidation of the Gypsum corporation. Brown was to advance them $2,500 as required from time to time, and they (Jones and McCormick) were to pay Brown a sum equal to 30 per cent. of all the net profits in stock and cash that they might receive, first deducting and repaying to Brown the $2,500 advanced by him (Brown). Plaintiffs say that if any transfer was made by the deceased (Brown) to his wife, prior to his death, it was while they were creditors of the deceased, and was without consideration, and with the intent of preventing plaintiffs from getting hold of the stock. The instrument by which Mr. Brown assigned any right accruing to him to receive stock which was to be issued to McCormick and Jones was in writing and bears upon its face a notation, in the handwriting of McCormick, now deceased, showing that he received it May 16, 1905, the day after its date. Plaintiffs again have failed to prove insolvency of Brown at the time of this assignment to his wife, while, on the other hand, the accountants who testified in this Court demonstrated that in May, 1905, Brown had over $30,000 in bank, and still had of his original shares 130 preferred and 230 common, and owned valuable real estate in Omaha. The fact is that this accruing right to Brown to receive stock under the arrangement with McCormick and Jones seems to have been somewhat outside of his original arrangement with the English brothers.

It appears that between 1903, when Brown transferred to his wife the stock referred to in the previous part of this opinion, and May 15, 1905, the date of the execution of the assignment of the stock to

come from McCormick and Jones to Brown, Brown kept on using as his own and putting to his individual credit in banks large sums of money collected on account of the rentals of the separate property of his wife, defendant in this suit. Furthermore, he received annuity moneys due to her, so that altogether, when he turned over the McCormick stock to her, the aggregate moneys for which he became accountable to his wife amounted to at least $3,965.77. This amount excludes items of $2,724.72 and $400, which the defendant claims ought to be included as a receipt by Mr. Brown of moneys belonging to Mrs. Brown; but, as Mrs. Brown's recollection as to these items was so vague that she could give no aid in explanation of the matters they should be excluded.

Furthermore, there is nothing to show that at the time of this 1905 transfer the English brothers had made any claim against Brown. Without entering upon a precise application of what legal rule should be applied with respect to the burden of proof, it is enough to say that Mrs. Brown has shown that there was valuable consideration, that there was good faith, and that her husband was solvent when this transfer was made. The fact that the transfer was made but a few weeks prior to the institution of the suit by the English brothers against Brown in the Supreme Court of the state of New York has had most attentive consideration on my part, and the whole surrounding circumstances connected with this 1905 transfer have been weighed with special care, yet the conclusion is irresistible that, when the transfer was made, Brown was solvent and paid a fair consideration, and that he and his wife acted in good faith in the matter.

III. Let us now move to the transaction of August 3, 1909. Here we find a changed situation. The plaintiffs had brought their suit against Mr. Brown on June 13, 1905, and had obtained a judgment in 1906, so that Brown knew of the established right of the English brothers to the stock or money under the original agreement made with them, and Mrs. Brown, of course, knew of the institution and determination of this suit, although she was not a party to it. It is a most reasonable construction of her whole testimony that she and her husband had the greatest confidence in each other, and, as they had had mutual dealings in Gypsum stock, it would be against the ordinary rules of human nature to assume for a moment that she did not know of the existence of the suit by the English brothers against her husband and judgment in their favor. So, too, for like reasons did she know of the attachment issued in the action by her husband against the English brothers. It may be assumed that between May 15, 1905, and August 3, 1909, her advances to her husband and his collections for her account aggregated $20,963.18, so that when, in 1909, Mr. Brown transferred to her all the stock he then had in the corporation, 130 shares of preferred and 230 shares of common stock, their value was inadequate to cover his debt to her. But, even so, it is plain that at least much of the money advanced by her was received by Brown when he was in failing circumstances, and when Mrs. Brown knew he was so situated, and the shares were turned over to Mrs. Brown when he was without means wherewith to meet the claims of the English brothers under the original agreement between himself and them, and when he and his wife both

knew that the English brothers were diligently pressing their rights and that the transfer of the stock would necessarily operate to hinder and delay the collection of the New York judgment held by the English brothers, and which was without just right attached by Brown.

I should say that under such circumstances, the transaction ought not to be sustained, for the manifest purpose of the turning over on his part was to make it impossible for his judgment creditors to recover that to which they were justly entitled, and to which they had been entitled ever since the organization of the Gypsum Company, and I think it must be found that the wife for the purpose of aiding him as well as to obtain a preference took the shares with full knowledge of the circumstances and of the judgment, and of the proceedings on the part of her husband to defeat the payment of the same, and that his and her acts were done with a purpose of hindering and defeating his creditors, the English brothers.

The position taken by the defendant is that the transfer of 1909 was a pledge, whereas the transfers of 1903 and 1905 were full acquittances. While such a distinction should not change the result, I cannot distinguish the last transfer from the two previous ones. I should say that the transfer of 1909 was of the same character as the preceding ones, and is not to be treated as a pledge. If one was a transfer by way of sale, all were. No note was given by the husband to the wife, and no essential differences surround the several forms of transfer. This view is justified by the vagueness of the testimony of Mrs. Brown concerning the matter of a loan and deposit as collateral, as well as by her failure to set forth in her account as administratrix the ownership by her husband of any shares which were delivered or transferred to her in 1909. If the shares were merely pledged, his estate would have had a sufficient interest in them to require the administratrix to describe and include them, and the creditors would have a right to know the fact concerning such ownership and when and how it ceased. Granting that a voting trust agreement existed in 1909, and that the stock was held in the form of voting trust certificates, and that for this reason the transfer from Mr. Brown to Mrs. Brown would not appear upon the books of the corporation, yet notwithstanding this, and the fact that the legal title to the shares may have been in the voting trustees, if the transaction was merely a pledge, there must have been an equity in Brown as the real owner of the shares, which ought to have been disclosed and referred to by the administratrix and Mrs. Brown.

I have not failed to read the note incorporated in the audited and stated account of Mrs. Brown as administratrix, filed in the orphans' court in New Jersey on December 6, 1912, wherein she states that she does not set forth the individual claim of herself against the estate for moneys loaned to Mr. Brown during his life, and which he promised to repay, because the expense of enlarging the account with such items, which ran into thousands of dollars, would be a burden to the accountant, in view of the fact that there was no likelihood of the estate being able to pay such further claims of the accountant, in view of the insolvency of the estate. But omission on the part of Mrs. Brown to set forth her individual claims ought not to excuse her from including any

equitable ownership which the decedent, her husband, had in property under a pledge, whether or not the pledge was made to her in her individual capacity. It is to be observed too, that in her answer Mrs. Brown expressly says that Mr. Brown did—

"agree to and did sell, assign, transfer, and set over to this defendant the 130 shares of preferred stock and 230 shares of common stock of the United States Gypsum Company, * * * and this defendant thereupon accepted said stock in acquittance of said advances so made as aforesaid, and in payment of the indebtedness then due this defendant from the said Charles B. Brown, and in payment of the further sum at that time advanced by this defendant to the said Charles B. Brown, and that said sums so due this defendant, and so advanced by this defendant to the said Charles B. Brown, at and prior to the said 3d day of August, 1909 (but subsequent to May 15, 1905), were greatly in excess of the value of the stock so transferred and sold to this defendant at or about said time as aforesaid."

[6] It may be conceded that a creditor of an insolvent debtor may be preferred (Green v. McCrane, 55 N. J. Eq. 436, 37 Atl. 318; Lehrenkrauss v. Bonnell, 99 N. Y. 240, 92 N. E. 637); and that this rule may prevail, even though the wife is the preferred creditor (Jewell v. Knight, 123 U. S. 426, 8 Sup. Ct. 193, 31 L. Ed. 190); and that a transfer may under certain circumstances be made for a valuable consideration by a husband to his wife when the husband is in failing circumstances. But, while such a conveyance may be made for a valuable consideration, it nevertheless must have been executed and received in good faith and for an honest purpose. That is to say, good faith, as well as a valuable consideration, is necessary to support a conveyance from husband to wife as against creditors standing in the position of the plaintiffs in the present suit. The general doctrine goes way back to Twyne's Case (1601), 3 Coke, 80; it is stated by Lord Mansfield in Cadogan v. Kennett (1776) 2 Cowper's Reports, 432.

There Lord Mansfield, discussing the statute of 13 Elizabeth, which relates to frauds against creditors, cited the case of a person where, with knowledge of a decree of a Court of Chancery and sequestration of the house and building, gave a full price for them, it was held the purchase being with the manifest view to defeat the creditor, was fraudulent, and therefore, notwithstanding a valuable consideration, void. He continued, saying:

"So, if a man knows of a judgment and execution, and, with a view to defeat it, purchases the debtor's goods it is void, because the purpose is iniquitous. It is assisting one man to cheat another, which the law will never allow. There are many things which are considered as circumstances of fraud. The statute says not a word about possession. But the law says, if after a sale of goods, the vendee continue in possession, and appear as the visible owner it is evidence of fraud, because goods pass by delivery. But it is not so in the case of a lease, for that does not pass by delivery."

Cadogan v. Kennett, supra, was expressly cited with approval by the Supreme Court of the United States in Clements v. Moore, 6 Wall. 299, 18 L. Ed. 786. There the court said:

"A sale may be void for bad faith, though the buyer pays the full value of the property bought. This is the consequence, where his purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys recklessly, with guilty knowledge." Wadsworth v. Williams, 100 Mass. 126; Robinson v. Holt, 39 N. H. 557, 75 Am. Dec. 233.

An interesting case of where a purchaser of property transferred by a debtor to defraud his creditors paid full value, and yet the sale was set aside as against the creditor, is found in Green v. Tantum, 19 N. J. Eq. 105. The court there recognized that, if the vendor intended fraud and the vendee was innocent and paid the consideration for the transfer in good faith without knowledge of such intent, the title could not be injured by the vendor's fraudulent intent. But it appeared that the vendee knew of the pendency of a suit against the vendor, and of a verdict which had been rendered in such suit against the vendor, and because of many circumstances not necessary here to be recited was put upon inquiry, and so charged with notice, and that a court of equity would deprive him of the character of a bona fide purchaser without notice. The chancellor in his opinion said that it was easy to believe that the answer was literally true, and that the vendee in the case had no knowledge of any intent of his vendor to defraud the complainant by the transfer; but he held that, if the circumstances were such as must and ought to have aroused in the vendee's mind, in spite of the fact that the fraudulent intent was not announced and an honest purpose pretended, a conviction that the object was to delay the complainant, the answer should not protect him.

The transfer was from one brother to another, but for full consideration, and the suit was by a creditor to have the transfers declared void as against her. In the discussion of the facts, it is expressly stated that there was no direct proof that the vendee brother knew of any intent on the part of the vendor brother by the assignment to defraud the particular creditor by taking the transfer, and there was no part of the proof which directly or by implication connected the vendee brother with the design of the vendor brother to defraud his creditor. I quote from the opinion of Chancellor Zabriskie:

"The facts before Dr. Tantum at the time of this transaction were such that they must have suggested to him that the object of his brother was to do just what he has since done—to transfer all his property in New Jersey to some purchaser, for value actually paid over, before they were attached or seized in any way, so as to be beyond the reach of the complainant. This, although no knowledge in its strict or literal sense, so as to make his denial of knowledge of that intent perjury, yet is such notice of circumstances of suspicion that should have put him upon inquiry as will deprive him, in a court of equity, of the character of a bona fide purchaser without notice. A person is to be charged with notice when he is acquainted with circumstances sufficient to convince a court or jury of the truth of the fact."

This case was affirmed in 21 N. J. Eq. (6 C. E. Green) 364.

In the light of the foregoing views, the judgment for $5,412.91 in the action for malicious prosecution, because of the attachment which had been obtained by Mr. Brown against the English brothers, loses real importance in the case, for the reason that the judgment was entered after the death of Mr. Brown, and against the administratrix, who appears not to have any property belonging to the estate of her husband, except that involved in the matters heretofore passed upon, and which is not of a quantity or value in excess of the demands to which Mrs. Brown must respond under the judgment for $21,534.27.

Having now disposed of the material features of the case, it remains

to exercise a proper jurisdiction. In Clements v. Moore, 6 Wall. 299, 18 L. Ed. 786, after referring to the flexibility and tolerant jurisdiction to be exercised in equity, Justice Swayne said:

"The cardinal principle is * * * that the property of a debtor shall not be diverted from the payment of his debts to the injury of his creditors, by means of the fraud."

Applying to the best of my judgment the underlying rule, I conclude that the making over and receipt of the stock in 1909 after notice was given by the institution of the original action in the Supreme Court of New York, wherein the English brothers were plaintiffs and Mr. Brown was defendant, have been prejudicial to the rights of the English brothers, creditors of Mr. Brown. If Mrs. Brown now holds the shares of stock in the Gypsum Company which were transferred to her by her husband on August 3, 1909, preferred and common, she will be regarded as a trustee, whose duty it is to transfer such shares to the English brothers, together with all the dividends which she has collected upon such shares from and after August 3, 1909, and up to the time of the delivery, together with interest on the dividends so collected from the date of the receipts of the dividends, and against the amounts of the dividends collected, she should be credited with any sums of money that the books in evidence show she advanced to Mr. Brown or that Mr. Brown collected for her account and failed to pay over, from the date of the transfer of the McCormick shares on May 15, 1905, up to the date of the institution of the action by the English brothers against her husband, which was June 13, 1905. If, however, Mrs. Brown has sold the shares of stock turned over to her on August 3, 1909, by her husband (and it would seem she has), then she must account for and pay to the plaintiffs all moneys received on account of the sales of said shares of stock as such sales have been made for Mrs. Brown's account from time to time, together with all dividends received on the shares so sold up to the time of the sale or sales thereof, with interest on any and all dividends collected by her from the time of the receipt of such shares or any thereof until the rendition of this decree, together with interest at the current rate of interest in New Jersey upon any moneys received from the sales of stock from the date of the respective sales up to the time of the rendition of this decree; and against the amounts so due, she should be credited with any sums of money that the books in evidence show she advanced to Mr. Brown or which he collected for her account, but failed to turn over to her, from the date of the transfer of the McCormick shares on May 15, 1905, up to the date of the institution of the action in New York by the English brothers against her husband, June 13, 1905.

Before final decree in the premises may be entered, the court will hear further testimony with respect to the situation and disposition of the stock transferred in 1909, and then make an accounting along the lines just laid down.